**KNITWAVES, INC., Plaintiff–Appellee–Cross–Appellant,**

v.

**LOLLYTOGS LTD. (INC.) d/b/a French Toast, Defendant–Appellant–Cross–Appellee.**

**Nos. 1208, 1392, Dockets 94–7968, 94–9024.**

United States Court of Appeals, Second Circuit.

Argued March 20, 1995.

Decided Nov. 13, 1995.

Gerard F. Dunne, New York City (Law Offices of Gerard F. Dunne, P.C., of counsel), for Defendant–Appellant–Cross–Appellee.

Neil M. Zipkin, New York City (Neil S. Goldstein, Amster, Rothstein & Ebenstein, of counsel), for Plaintiff–Appellee–Cross–Appellant.

Before: OAKES, KEARSE and LEVAL, Circuit Judges.

OAKES, Senior Circuit Judge:

This appeal involves principles of copyright and trade dress as applied to the design of children's sweaters. Specifically, it involves the evaluation of "substantial similarity" of clothing designs under the Copyright Act; the "inherent distinctiveness" of trade dress under the Lanham Act when the dress involved is not packaging or labeling but a product's features; and various issues involving remedies, particularly the award of attorney's fees, under the Copyright Act.

In 1990, Knitwaves, Inc., a manufacturer of children's knitwear, introduced its "Ecology Group" collection of sweaters, consisting of various styles of girls' sweaters and accompanying skirts and pants, presenting "ecology" themes in "fall" colors. It obtained copyrights for the designs of the two sweaters at issue in this litigation—its "Leaf Sweater," a multicolored striped sweater with puffy leaf appliques, and its "Squirrel Cardigan," which has a squirrel and leaves appliqued onto its multipaneled front. In 1992, Lollytogs Ltd., a larger manufacturer which sells children's clothing under the nationally advertised French Toast label, introduced a competing line of fall sweaters, including a similar-looking Leaf Sweater and Squirrel Cardigan admittedly copied from Knitwaves' sweaters. (Photographs of the competing sweaters are reproduced as an appendix to the opinion.) Knitwaves sued Lollytogs in the Southern District of New York for copyright infringement and for unfair competition under the Lanham Act and New York law.

On September 1, 1992, the district court, John S. Martin, Jr., *Judge*, granted Knitwaves a preliminary injunction. After a bench trial, on June 1, 1994, the court issued a memorandum and order, finding that Lollytogs willfully copied Knitwaves' designs in violation of the Copyright Act, the Lanham Act, and New York law. On September 2, 1994, following post-trial briefing, a permanent injunction was entered against Lollytogs as well as judgment in the amount of $193,681.72, constituting statutory damages, infringing profits and lost profits, and costs and attorney's fees. Lollytogs now appeals, and Knitwaves cross-appeals on the amount of damages.

We hold that: (1) the district court properly found that Lollytogs illegally copied Knitwaves' Leaf Sweater and Squirrel Cardigan, in violation of the Copyright Act; (2) the district court's finding that Lollytogs violated the Lanham Act was erroneous, as was (3) its award of $12,000 in lost profits; (4) the district court did not err in declining to apportion damages, or in (5) finding the copying to be willful; (6) the court awarded excessive attorney's fees; and (7) the court did not abuse its discretion by declining to enhance its award of statutory damages.

## BACKGROUND

Knitwaves has been designing and manufacturing children's knitwear in New York and New Jersey since 1976. According to testimony, Knitwaves is a "design intensive" manufacturer; although the company is relatively small, it spends well over $1 million a year on designing and introducing new products. Knitwaves' designs have resulted in substantial recognition in the clothing trade,

including several industry awards. Because its goods are designed at its showroom facilities and manufactured domestically, Knitwaves' costs are higher than those of many of its competitors, and its commercial survival remains dependent on its reputation for innovative design and high-quality manufacturing.

In 1989, Knitwaves designers began work on the Ecology Group collection of girls' sweaters and matching skirts and pants. Each item in the group incorporated design elements intended to express a "fall" motif, such as leaves, acorns, squirrels, and the like, for introduction for the fall 1990 season. In addition, the sweaters employed what Knitwaves designers describe as innovative color schemes, using "fall" colors, such as mustards and browns, rather than the usually brighter children's tones. The Ecology Group sold well and received some trade attention. The Leaf Sweater and Squirrel Cardigan, in particular, were featured in advertisements by Knitwaves and its retail customers, and in editorial comments by the trade press. Knitwaves obtained copyright registration for the artwork on its Squirrel Cardigan in March 1990, but did not register the artwork on its Leaf Sweater until May 1992.

In August 1992, Justin Israel, Knitwaves' chairman, noticed girls' sweater sets, closely resembling the Leaf and Squirrel sweaters and bearing the French Toast label, in a Philadelphia department store. After finding the Lollytogs sweaters in several other stores which, like the Philadelphia store, also carried Knitwaves sweaters, Knitwaves brought this action for copyright and trade dress infringement.

Deposition testimony produced the following account by Lollytogs' personnel of Lollytogs' decision to introduce its competing line of fall sweaters.

In 1992, Sam Gindi, a design executive at Lollytogs, informed Cynthia Laino, the manager of Lollytogs' design department, that he wished to produce garments with a fall design motif. He presented her with Knitwaves' Leaf and Squirrel sweaters and instructed her to design sweater sets with the "same feel" as the Knitwaves sweaters. Lai-

no testified that she copied what she considered the "non-original" aspects of the sweaters—the stripes on the Leaf Sweater, and both sweaters' use of fall motifs such as leaves, acorns, and squirrels—but determined to "change what was original" in the sweaters so as to avoid copyright infringement:

> I believe the leaves and how they were placed on the garment, how many there were, how many different types of leaves, they were original. So, therefore, I made only two different types of leaves and I arranged them differently. I grouped them, instead of scattering them, I added acorns, and there is only one color stitches on the leaves at a time instead of two.
>
> . . . I deliberately set out to create new art work with a fall theme. I deliberately set out to make new leaves, new squirrel, new Jacquard pattern.

Transcript of proceedings of Aug. 31, 1992, at 62–63, 67.

Laino admitted that, in designing the Leaf and Squirrel sweaters, she used no reference materials other than Knitwaves' sweaters and produced very little original artwork. When it came time to instruct Lollytogs' foreign manufacturer what the stripes should look like on Lollytogs' Leaf Sweater, Lollytogs merely sent Knitwaves' Leaf Sweater to its supplier and told it to copy the stripes. In addition, while Laino testified that she designed the leaves for Lollytogs' sweaters herself, any differences between the stylized oak and maple leaves on the two companies' sweaters are minimal, at best. Laino's artwork for the leaf appliques contains the notation "two-tone stitching *same as sample*" (emphasis added), clearly referring to Knitwaves' Leaf Sweater from which she was working.

Knitwaves' director of operations, Robert Israel, testified that as a result of the direct competition from Lollytogs, Knitwaves was required to reduce the price of its Leaf Sweaters and Squirrel Cardigans, and was unable to sell its full Ecology Group inventory, resulting in lost profits of approximately $12,000.

At the preliminary injunction hearing, the court accepted the uncontested testimony of Knitwaves' Anthony Ransola that the Leaf and Squirrel sweaters were created from his original designs. The court did not credit the testimony of Gindi and Laino that they set out to establish a new design. Instead, the court concluded, "I think they set out to knock it off and they clearly did that." Transcript of proceedings of Sept. 1, 1992, at 2–3. Applying this circuit's test for unlawful "substantial similarity"—whether "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work," *Malden Mills, Inc. v. Regency Mills, Inc.*, 626 F.2d 1112, 1113 (2d Cir.1980) (quoting *Ideal Toy Corp. v. Fab–Lu Ltd.*, 360 F.2d 1021, 1022 (2d Cir.1966))—the court concluded that both sweaters were unlawful copies, warranting an injunction against Lollytogs' continued sale of its infringing sweaters. In addition, the court found that Lollytogs' copyright violation was willful, entitling Knitwaves to an order requiring an immediate recall of all Lollytogs' infringing sweaters.

Additionally, the district court found that an injunction was also warranted under the Lanham Act and under New York's law of unfair competition. The court found the design of Knitwaves' sweaters inherently distinctive, and it found a likelihood of confusion between the two companies' products: consumers, seeing Knitwaves' and Lollytogs' similar sweaters on the store racks—in some cases, next to each other in the same store— would likely think they were looking at products from the same manufacturer.

On June 1, 1994, after discovery and a bench trial on the parties' submitted affidavits and exhibits, the district court issued its memorandum and order, adopting and reaffirming the findings and conclusions made at the preliminary injunction hearing. The court found that Lollytogs willfully copied Knitwaves' designs and that its conduct constituted a willful violation of the Copyright Act, the Lanham Act, and the New York law of unfair competition. The court awarded attorney's fees to Knitwaves. Additionally, it found that Knitwaves was entitled to $36,690.71 in damages pursuant to 17 U.S.C. § 504(b), representing Lollytogs' wrongful profits on its infringing tops and matching bottoms ($13,221.20 for the Leaf Sweater and $23,469.51 for the Squirrel Cardigan). Since Lollytogs' outfits were sold as a set, the court found, apportionment would be inappropriate. Alternatively, in lieu of actual damages, the court found Knitwaves entitled to $25,000 in statutory damages pursuant to 17 U.S.C. § 504(c)(2) for each of Lollytogs' two willful infringements, for a total of $50,000. Knitwaves was instructed to advise the court of its election of actual or statutory damages, as well as of its attorney's fees.

Knitwaves concluded that it was not entitled to statutory damages for infringement of its Leaf Sweater since the infringement commenced before May 1992, when Knitwaves obtained copyright registration for the sweater. *See* 17 U.S.C. § 412. Consequently, Knitwaves elected actual damages of $13,221.20 for infringement of the copyright on the Leaf Sweater, along with statutory damages of $25,000 for willful infringement of its Squirrel Cardigan.

In addition to the above-mentioned actual and statutory damages, the court awarded Knitwaves $12,000 in lost profits under the Lanham Act, 15 U.S.C. § 1117, representing the amount Knitwaves was required to reduce the total selling price of its remaining inventory of its sweaters and coordinates. Additionally, based on the court's finding that Lollytogs' infringement was willful and in bad faith, the court awarded Knitwaves $143,460.52 in costs and attorney's fees under both the Copyright Act, 17 U.S.C. § 505, and the Lanham Act, 15 U.S.C. § 1117. Lollytogs was permanently enjoined from future sales of the Leaf and Squirrel sweaters, and was required to allow Knitwaves to verify and witness the destruction of any of these sweaters remaining in Lollytogs' possession.

## DISCUSSION

On appeal, Lollytogs contends that the district court erred in: (1) finding that its sweaters infringed Knitwaves' copyrights; (2) finding a Lanham Act violation; (3) awarding Knitwaves $12,000 in lost profits; (4) awarding Knitwaves the profits made by Lollytogs on the sale of its sweaters-and-

pants combinations, rather than apportioning damages and awarding only profits on the sale of its sweaters; (5) finding Lollytogs' infringement willful; and (6) awarding Knitwaves its full attorney's fees and expenditures. On cross-appeal, Knitwaves contends that the court abused its discretion by failing to enhance its awards further under both the Copyright Act and the Lanham Act.

## I. *The Finding of Copyright Infringement*

■ As " 'useful article[s]' . . . having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information," 17 U.S.C. § 101, clothes are not copyrightable. *Whimsicality, Inc. v. Rubie's Costume Co.*, 891 F.2d 452, 455 (2d Cir.1989). In contrast, fabric designs, such as the artwork on Knitwaves' sweaters, are considered "writings" for purposes of copyright law and are accordingly protectible. *Folio Impressions, Inc. v. Byer California*, 937 F.2d 759, 763 (2d Cir.1991); *see also Soptra Fabrics Corp. v. Stafford Knitting Mills, Inc.*, 490 F.2d 1092 (2d Cir. 1974); *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487 (2d Cir.1960) (L. Hand, J.).

■ To prove infringement, a plaintiff with a valid copyright must demonstrate that:

> (1) the defendant has actually copied the plaintiff's work; *and* (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's.

*Fisher–Price, Inc. v. Well–Made Toy Mfg. Corp.*, 25 F.3d 119, 122–23 (2d Cir.1994); *and see Laureyssens v. Idea Group, Inc.*, 964 F.2d 131, 140 (2d Cir.1992); *Folio Impressions*, 937 F.2d at 765.

■ Lollytogs does not dispute the validity of Knitwaves' copyrights or that it copied Knitwaves' sweater designs; it contends, however, that it altered the designs enough so that its sweaters are not "substantially similar" to Knitwaves'. It notes that "[w]hile no plagiarist can excuse the wrong by showing how much of his work he did not pirate, a defendant may legitimately avoid infringement by intentionally making sufficient

changes in a work which would otherwise be regarded as substantially similar to that of the plaintiff's." *Warner Bros, Inc. v. American Broadcasting Cos.*, 654 F.2d 204, 211 (2d Cir.1981) (citations and internal quotations omitted). We review the issue of "substantial similarity" *de novo. Fisher–Price*, 25 F.3d at 123.

■ In most cases, the test for "substantial similarity" is the so-called "ordinary observer test" which the district court applied: whether "an average lay observer would [ ] recognize the alleged copy as having been appropriated from the copyrighted work." *Folio Impressions*, 937 F.2d at 766 (quoting *Novelty Textile Mills v. Joan Fabrics Corp.*, 558 F.2d 1090, 1093 (2d Cir.1977)); *see also Malden Mills*, 626 F.2d at 1113; *Laureyssens*, 964 F.2d at 141 (test is "whether 'the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same' ") (quoting *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir.1960) (L. Hand, J.)).

■ However, as Lollytogs notes, where we compare products that contain both protectible and unprotectible elements, our inspection must be "more discerning"; we must attempt to extract the unprotectible elements from our consideration and ask whether the *protectible elements, standing alone*, are substantially similar. *Fisher–Price*, 25 F.3d at 123; *Laureyssens*, 964 F.2d at 141; *Folio Impressions*, 937 F.2d at 765–66. As we have elaborated:

> [T]he plaintiff must show that the defendant appropriated the plaintiff's particular means of expressing an idea, not merely that he expressed the same idea. The means of expression are the "artistic" aspects of a work; the "mechanical" or "utilitarian" features are not protectible.

*Fisher–Price*, 25 F.3d at 123 (citations omitted).

Lollytogs contends that the district court erred in comparing the sweaters through the traditional "ordinary observer" test rather than through the "more discerning" test. Brief for Defendant–Appellant–Cross–Appellee at 20. Instead of comparing the sweater

designs as a whole, Lollytogs contends, the court should have "extracted the unprotectible elements"—namely, the use of common stripes and colors—and compared only the sweaters' distinctive elements, *i.e.,* their placement of leaves, squirrels, and other "original" elements.[1] *Id.* at 21. Viewed without their common background elements, Lollytogs urges, the sweaters' designs appear substantially *dis*-similar, as distinctions among their details, such as the fabric, outlines, and placement of the leaves, become apparent.

Lollytogs' argument, however, misconstrues the nature of our inquiry into "substantial similarity." We do not believe that we are required by the "more discerning ordinary observer test" to undertake so mechanical and counterintuitive an exercise as Lollytogs suggests. Lollytogs' argument rests on one case, *Folio Impressions,* 937 F.2d 759, and we believe that Lollytogs has accorded this case too broad a reading.

*Folio Impressions* concerned the copying of a fabric design consisting of an arrangement of stylized roses on a complex background. Testimony at trial revealed that the pattern's designer had photocopied the background from a document in the studio's possession which was admitted to be in the public domain. 937 F.2d at 764. The studio had "contributed nothing, not even a trivial variation." *Id.* Since the background design was entirely devoid of originality, we concluded that it was not copyrightable, *id.,* and consequently that copyright extended only to the roses which were superimposed on top, *id.* at 763, and to the arrangement of those roses, *id.* at 764–65.

Having narrowed the scope of the copyright, we applied the "more discerning" ordinary-observer test and compared only the protected portion of the design, namely, the roses and the way they were arranged, rather than their display against the ornate background. *Id.* at 765–66. Compared in this way, we found noticeable the fairly subtle differences between the roses in the two patterns. *Id.* at 766. On the basis of these distinctions, we concluded that "an average lay observer would not recognize the alleged copy as having been appropriated from the copyrighted work." *Id.* (quoting *Novelty Textile Mills,* 558 F.2d at 1093).[2]

We do not consider the rather specialized facts of *Folio Impressions* as authority for the broad proposition which Lollytogs advances: that, in comparing designs for copyright infringement, we are required to dissect them into their separate components, and compare only those elements which are in themselves copyrightable. As the district court noted, if we took this argument to its logical conclusion, we might have to decide that "there can be no originality in a painting because all colors of paint have been used somewhere in the past." Transcript of proceedings of Sept. 1, 1992, at 4.

It is commonplace that in comparing works for infringement purposes—whether we employ the traditional "ordinary observer" test or the *Folio Impressions* "more discerning" inquiry—we examine the works' "total concept and feel." *See Eden Toys, Inc. v. Marshall Field & Co.,* 675 F.2d 498, 500 (2d Cir.1982). As the Supreme Court's decision in *Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991), makes clear, a

---

1. Since, as described below, we compare the designs of Knitwaves' and Lollytogs' sweaters as a whole, we need not rule here on Lollytogs' contention that the background stripes of Knitwaves' Leaf Sweater, taken alone, would be uncopyrightable. We note only that stripes, if complex enough, have been found to possess the modicum of creativity required for copyright protection. *See Stevens Linen Assocs., Inc. v. Mastercraft Corp.,* 208 U.S.P.Q. 669, 670 (S.D.N.Y.1980) (copyright was valid for woven fabric made of complex stripes); *Couleur Int'l Ltd. v. Opulent Fabrics, Inc.,* 330 F.Supp. 152, 153 (S.D.N.Y. 1971) (design based on repetition of six stripes

found copyrightable); *cf. Jon Woods Fashions Inc. v. Curran,* 8 U.S.P.Q.2d 1870, 1871–72, 1988 WL 38585 (S.D.N.Y.1988) (combination of stripes and grid found uncopyrightable as "familiar symbols or designs" lacking in originality) (quoting 37 C.F.R. § 202.02(a)).

2. Additionally, we found questionable whether the defendant had copied the plaintiff's design at all, or instead arrived at its similar design entirely on its own by deciding to superimpose stylized roses on a background which, like the plaintiff, it found among its collection of prints. *Id.*

work may be copyrightable even though it is entirely a compilation of unprotectible elements. *See id.* at 362, 111 S.Ct. at 1296 (even telephone directory may be copyrightable if its listings are selected, coordinated, or arranged in an original fashion). What is protectible then is "the author's original contributions," *id.* at 350, 111 S.Ct. at 1290—the original way in which the author has "selected, coordinated, and arranged" the elements of his or her work. *Id.* at 358, 111 S.Ct. at 1294. In this case, Knitwaves' "original contribution" consists not merely—as Lollytogs would have it—in arranging leaves or squirrels in a specific pattern, but in (1) selecting leaves and squirrels as its dominant design elements; (2) coordinating these design elements with a "fall" palette of colors and with a "shadow-striped" (for the Leaf Sweater) or a four-paneled (for the Squirrel Cardigan) background; and (3) arranging all the design elements and colors into an original pattern for each sweater.[3]

Viewed in this way, it is clear to us that Lollytogs' Leaf and Squirrel sweaters are substantially similar to Knitwaves'. Lollytogs has chosen to feature the same two fall symbols that Knitwaves used, leaves and squirrels. Not only do Lollytogs' renderings of these symbols substantially resemble Knitwaves' renderings, but Lollytogs has employed them in virtually the same manner as Knitwaves has (as felt appliques stitched to the sweaters' surface); on strikingly similar backgrounds ("shadow-striped" for the Leaf Sweater, and four-paneled for the Squirrel Cardigan); and in virtually the same color scheme.[4] An observer viewing the sweaters side by side cannot help but perceive them as coming from one creative source.

Given the overwhelming similarity of the sweaters' "total concept and feel," we are not convinced by Lollytogs' lengthy recitation of differences. *Cf. Cofre Inc. v. Lollytogs Ltd.,* 20 U.S.P.Q.2d 1546, 1548, 1991 WL 40366 (S.D.N.Y.1991) ("it is the similarities one notices, rather than the differences, when one views the two outfits"). As to the Leaf Sweaters, Lollytogs points out that it has arranged its leaf appliques differently from Knitwaves' arrangement: while Knitwaves' sweater has eight leaves scattered in three rows along the front of the sweater, Lollytogs' sweater has only five leaves—two pairs above and one leaf below. Additionally, Lollytogs' sweater contains small appliques of acorns next to each leaf or pair of leaves, and while Knitwaves employs a puffy "polar fleece" material for its appliques, Lollytogs uses a more conventional, and thinner, felt. As to the Squirrel Cardigans, Lollytogs notes that although they share a similarly colored four-quadrant design, with squirrel and leaf appliques in the upper left and lower right quadrants, Lollytogs, unlike Knitwaves, has placed its squirrel below and its single leaf above. Furthermore, while Knitwaves' sweater employs jacquard patterns of mushrooms and acorns in the remaining quadrants, Lollytogs employs a jacquard leaf pattern instead.

These differences in detail, while requiring considerable ink to describe, do little to lessen a viewer's overwhelming impression that the two Lollytogs sweaters are appropriations of the Knitwaves sweaters. We note that much of this impression is conveyed by the sweaters' bold, and almost identical, color schemes (the effect of which is entirely lost in the black-and-white reproductions append-

---

**3.** We examined the patterns otherwise in *Folio Impressions*—we "extracted" the background design from our comparison of the superimposed roses—only because the background had been copied from a document in the public domain and thus was not part of the author's original contribution. 937 F.2d at 765–66. In contrast, in the instant case, Lollytogs has not contended that the background of Knitwaves' leaf sweaters was copied from the public domain; rather, uncontested testimony at trial established that the sweaters were original creations in their entirety. *See Feist,* 499 U.S. at 345, 111 S.Ct. at 1287

("Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity").

**4.** With regard to the Leaf Sweaters, Lollytogs has also copied Knitwaves' unusual manner of stitching the leaves to the sweater: the leaves on both sweaters are not stitched around their edges but rather along the veins of the leaves, leaving the edges unattached.

ed to this opinion).[5] *See Novelty Textile Mills,* 558 F.2d at 1095 (Mansfield, *J.,* concurring and dissenting) (color should be considered in determining infringement); *Soptra Fabrics Corp. v. Stafford Knitting Mills, Inc.,* 490 F.2d 1092, 1094 (2d Cir.1974) (same). To the average observer—or, more specifically, to the average consumer of these sweaters—the differences pale in comparison to the overwhelming impression of similarity.

Since we find Lollytogs' Leaf and Squirrel sweaters substantially similar to Knitwaves', we affirm the district court's holding that Lollytogs' Leaf and Squirrel sweaters violated the Copyright Act.

## II. *Knitwaves' Lanham Act Claim*

Lollytogs advances two reasons why we should reverse the court's finding that Lollytogs violated the Lanham Act. It contends, first, that the trade dress of Knitwaves' sweaters is not protectible, and, second, that the district court erred in finding a likelihood of confusion between Knitwaves' and Lollytogs' sweaters. As discussed below, we agree that the sweaters' trade dress is not protectible, and so we vacate that part of the court's order finding a Lanham Act violation, without addressing the issue of likelihood of confusion.

While "trade dress" at one time "referred only to the manner in which a product was 'dressed up' to go to market with a label, package, display card, and similar packaging elements," the concept "has taken on a more expansive meaning and includes the design and appearance of the product as well as that of the container and all elements making up the total visual image by which the product is presented to customers." *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 31 (2d Cir.1995). Trade dress, thus, is "'essentially [a product's] total image and overall appearance.'" *Id.* (quoting *Two Pesos, Inc., v. Taco Cabana, Inc.,* 505 U.S. 763, 764 n. 1, 112 S.Ct. 2753, 2755 n. 1, 120

L.Ed.2d 615 (1992)). *See also Restatement (Third) of Unfair Competition* § 16 & cmt. a (1995).

In contending that Knitwaves' sweaters are not protectible under the Lanham Act, Lollytogs relies primarily on what has been dubbed the "functionality" (or, more precisely in this case, the "aesthetic functionality") defense. *See Qualitex Co. v. Jacobson Prods. Co.,* —— U.S. ——, ——, 115 S.Ct. 1300, 1306, 131 L.Ed.2d 248 (1995); *Villeroy & Boch Keramische Werke K.G. v. THC Systems, Inc.,* 999 F.2d 619, 620–21 (2d Cir.1993); *Coach Leatherware Co. v. Ann-Taylor, Inc.,* 933 F.2d 162, 171 (2d Cir.1991); *Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co.,* 916 F.2d 76, 79–81 (2d Cir. 1990), *cert. denied,* 499 U.S. 976, 111 S.Ct. 1622, 113 L.Ed.2d 720 (1991); *Stormy Clime Ltd. v. ProGroup, Inc.,* 809 F.2d 971, 974–79 (2d Cir.1987); *LeSportsac, Inc. v. K Mart Corp.,* 754 F.2d 71, 78 (2d Cir.1985); *Restatement (Third), supra,* § 17 cmt. c. We have explained this doctrine and its relation to the other elements of a claim brought under section 43(a) of the Lanham Act as follows:

> An action for trade dress infringement under § 43(a) of the Lanham Act may be maintained if the plaintiff is able to show either that its trade dress is inherently distinctive, or, if the trade dress is not inherently distinctive, that it has acquired secondary meaning—that is, the trade dress identifies the source of the product—and that there is a likelihood of confusion between the original trade dress and the trade dress of the allegedly infringing product. Despite this type of showing, a defendant may avoid liability under § 43(a) of the Lanham Act if he or she is able to demonstrate that the allegedly similar trade dress feature is "functional."

*Villeroy,* 999 F.2d at 620 (citations and internal quotations omitted).

---

**5.** The stripes on Knitwaves' Leaf Sweater, in particular, were lifted entirely by Lollytogs, with only subtle changes; their color scheme remains the same on both sweaters—red, orange, olive, purple, yellow, green, orange, red, from top to bottom, separated by thin, black and brown "shadow stripes." The color scheme of Knit-waves' Squirrel Cardigan has likewise been lifted: progressing clockwise from the upper left, the quadrants are yellow, red, orange, and purple; they are divided by a green band which also rings the neck and waist of the sweater. The color schemes of the sleeves on the Knitwaves and Lollytogs sweaters are also identical.

The functionality doctrine, the Supreme Court has recently explained, "prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." *Qualitex*, —— U.S. at ——, 115 S.Ct. at 1304. Protection of functional product features is the province of patent law, not trademark law. *Id.* A product feature is functional " 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article,' that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." *Id.* (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 2187 n. 10, 72 L.Ed.2d 606 (1982)).

In *Wallace*, relying in part on the Draft *Restatement (Third) of Unfair Competition*, we held that the functionality doctrine may apply even to features of a product that are purely ornamental: "where an ornamental feature is claimed as a trademark and trademark protection would significantly hinder competition by limiting the range of adequate alternative designs, the aesthetic functionality doctrine denies such protection." 916 F.2d at 81; *see also Restatement (Third)*, *supra*, § 17 cmt. c ("A design is functional because of its aesthetic value only if it confers a significant benefit that cannot practically be duplicated by the use of alternative designs").

Lollytogs contends that the designs on Knitwaves' sweaters are functional in that their primary purpose is aesthetic—to enhance the sweaters' ornamental appeal—rather than to identify the sweaters as Knitwaves products. *See LeSportsac*, 754 F.2d at 78 (design of sport bag is non-functional, and therefore protectible, trade dress if its principal function is to identify the bag's maker rather than to make the bag aesthetically pleasing). By precluding Lollytogs from making sweaters with the basic "fall motifs" of squirrels and leaves, Lollytogs contends, Knitwaves would significantly restrict the number of designs available for apparel manufacturers wishing to compete in the back-to-school clothing market, and would thus foreclose Lollytogs from competing effectively in that market.

We find persuasive Lollytogs' contention that the primary purpose of Knitwaves' designs is aesthetic, but we do not agree that protecting the designs would restrict Lollytogs' ability to compete. Since functionality is a defense to a suit for trade dress infringement, "the burden therefore falls on the defendant to prove functionality." *Id.* at 76. Lollytogs has adduced no evidence whatsoever that the number of designs available for "fall motif" sweaters is limited, and that consequently extension of trade dress protection to Knitwaves' two sweater designs would restrict Lollytogs' ability to produce alternative competitive designs. *See Villeroy*, 999 F.2d at 621 (defendant manufacturer of chinaware could not demonstrate that chinaware designs were in such short supply that it could not compete in the market for hotel china without copying plaintiff's design); *cf. Wallace*, 916 F.2d at 80 (plaintiff's baroque silverware design was functional, and thus not protectible, because effective competition in the silverware market required use of "essentially the same scrolls and flowers").

Lollytogs argues too broadly. According trademark protection to Knitwaves' designs would not preclude Lollytogs from using fall colors or motifs, squirrels or leaves. It would preclude only the use of designs so similar as to create a likelihood of confusion.

Lollytogs thus cannot meet the market foreclosure requirement of functionality. The arguments it raises under the rubric of functionality, however, support a related (and more successful) argument: since the primary purpose of Knitwaves' sweater designs is aesthetic rather than source-identifying, Knitwaves' sweater designs do not meet the first requirement of an action under § 43(a) of the Lanham Act—that they be used as a mark to identify or distinguish the source.

As noted above, to prevail in an action for trade dress infringement under § 43(a) of the Lanham Act, a plaintiff must prove (1) that its dress is distinctive of the source and (2) that a likelihood of confusion exists between its product and defendant's product. *Jeffrey Milstein*, 58 F.3d at 31. To establish that a trade dress is distinctive of a particu-

lar source, a plaintiff must demonstrate either that it is "inherently distinctive" or that it has become distinctive through acquiring "secondary meaning" to the consuming public. *Villeroy,* 999 F.2d at 620.

Prior to the Supreme Court's decision in *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992), this circuit had held that trade dress, unlike trademarks, could never be inherently distinctive, and thus we required plaintiffs seeking § 43(a) protection of trade dress to establish distinctiveness by proving that the trade dress had acquired secondary meaning. *See, e.g., Wallace,* 916 F.2d at 79; *Stormy Clime,* 809 F.2d at 974. In *Two Pesos,* however, the Supreme Court rejected this circuit's approach, finding no "textual basis in § 43(a) for treating inherently distinctive verbal or symbolic trademarks differently from inherently distinctive trade dress." 505 U.S. at 774, 112 S.Ct. at 2760. Plaintiffs in trade dress infringement cases, just as in trademark cases, should be given a chance, the Court reasoned, to demonstrate that their trade dress is "capable of identifying products or services as coming from a specific source." *Id.* To deny such plaintiffs this opportunity until secondary meaning has been established would impose "particular burdens on the start-up of small companies," by allowing competitors to appropriate the plaintiff's dress in other markets and to deter the plaintiff from expanding into and competing in these areas. *Id.* at 775, 112 S.Ct. at 2761.

The *Two Pesos* decision left this circuit with the task of determining what it means for trade dress to be "inherently distinctive." In *Paddington Corp. v. Attiki Importers & Distribs., Inc.,* 996 F.2d 577 (2d Cir.1993), we addressed this issue and concluded that the test set out by Judge Friendly in *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976), for evaluating the inherent distinctiveness of trademarks was also applicable in the trade dress context. 996 F.2d at 583–84; *followed in Jeffrey Milstein,* 58 F.3d at 31–32. Under the *Abercrombie* test, marks are classified as either (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful. *Paddington,* 996

F.2d at 583. While generic marks can never serve to distinguish a source, and descriptive marks require a demonstration of secondary meaning in order to become distinctive, suggestive and arbitrary or fanciful marks are considered to be inherently distinctive. *Id.* Applying this reasoning, we examined the trade dress of a liquor bottle and found the bottle's label arbitrary in that "[t]he tone and layout of the colors, the style and size of the lettering, and, most important, the overall appearance of the bottle's labeling.... were selected from an almost limitless supply of patterns, colors and designs." *Id.* at 584. Finding the bottle's trade dress arbitrary, we concluded that it was *per se* distinctive. *Id.*

We do not find the analysis of *Paddington* appropriate in the case before us, in which the trade dress at issue consists of a product's features—the artwork on a sweater—rather than, as in *Paddington,* a product's packaging. Not only does the classification of marks into "generic," "descriptive," "suggestive," or "arbitrary or fanciful" make little sense when applied to product features, but it would have the unwelcome, and likely unintended, result of treating a class of product features as "inherently distinctive," and thus eligible for trade dress protection, even though they were never intended to serve a source-identifying function. The Third Circuit has made this point persuasively in a recent case:

> The difficulty is that ... a product configuration differs fundamentally from a product's trademark, insofar as it is not a symbol according to which one can relate the signifier (the trademark, or perhaps the packaging) to the signified (the product). Being constitutive of the product itself and thus having no such dialectical relationship to the product, the product's configuration cannot be said to be "suggestive" or descriptive" of the product, or "arbitrary" or "fanciful" in relation to it. The very basis for the trademark taxonomy—the descriptive relationship between the mark and the product, along with the degree to which the mark describes the product—is unsuited for application to the product itself.

*Duraco Prods., Inc. v. Joy Plastic Enterprises, Ltd.,* 40 F.3d 1431, 1440–41 (3d Cir.1994) (citations omitted). *See also Restatement (Third), supra,* § 16 cmt. b:

As a practical matter, ... it is less common for consumers to recognize the design of a product or product feature [as opposed to packaging features] as an indication of source. Product designs are more likely to be seen merely as utilitarian or ornamental aspects of the goods. In addition, the competitive interest in copying product designs is more substantial than in the case of packaging, containers, labels, and related subject matter. Product designs are therefore not ordinarily considered inherently distinctive and are thus normally protected only upon proof of secondary meaning.

The Supreme Court made a similar point recently when it addressed whether the Lanham Act permits registration of a trademark which consists solely of a color. A color, it noted, is "capable of satisfying the more important part of the statutory definition of a trademark, which requires that a person 'us[e]' or 'inten[d] to use' the mark 'to identify and distinguish his or her goods.... from those manufactured or sold by others and to indicate the source of the goods ...'" *Qualitex,* — U.S. at —, 115 S.Ct. at 1303 (quoting 15 U.S.C. § 1127). On the other hand, the Court noted, in an observation equally applicable to product features:

[A] product's color is unlike "fanciful," "arbitrary," or "suggestive" words or designs, which almost *automatically* tell a customer that they refer to a brand. The imaginary word "Suntost," or the words "Suntost Marmalade," on a jar of orange jam immediately would signal a brand or a product "source"; the jam's orange color does not do so.

*Id.* (citations omitted). Thus, the Court concluded, a product's color is capable of indicating a product's source, and thereby becoming eligible for trademark protection, only when it acquires secondary meaning as, over time, customers come to associate that color with the particular product. *Id.*

■ As noted above, in *Two Pesos* the Court concluded that trade dress—unlike col-

or alone, *see Qualitex*—may be inherently distinctive even without the addition of secondary meaning. We do not think, however, that the Court thereby intended to nullify what it called, in *Qualitex,* "the more important part of the statutory definition of a trademark"—the requirement "that a person 'us[e]' or 'inten[d] to use' the mark 'to identify and distinguish his or her goods ... from those manufactured or sold by others and to indicate the source of the goods.'" *Qualitex,* — U.S. at —, 115 S.Ct. at 1303 (quoting 15 U.S.C. § 1127); *see also Restatement (Third), supra,* § 16 cmt. b ("The imitation or even complete duplication of another's product or packaging will not create a risk of confusion unless some aspect of the duplicated appearance is identified with a particular source."). While "arbitrary," "fanciful," or "suggestive" packaging of a product may be presumed to serve this source-identifying function, and thus may be deemed *per se* distinctive of the source, *see Paddington,* 996 F.2d at 583, the same presumption may not be made with regard to product features or designs whose primary purposes are likely to be functional or aesthetic.

■ Accordingly, in determining whether each of Knitwaves' sweater designs can be protected as a trademark, we do not ask whether it is "generic," "descriptive," "suggestive," or "arbitrary or fanciful"—categorizations which we find inapplicable to product features. Rather, we ask whether it is "likely to serve primarily as a designator of origin of the product," *Duraco,* 40 F.3d at 1449. *Cf. Restatement (Third), supra,* § 13(a) (whether "because of the nature of the [design] and the context in which it is used, prospective purchasers are likely to perceive it as a [design] that ... identifies goods or services produced or sponsored by [Knitwaves]"); *and see id.* § 16; *Imagineering, Inc. v. Van Klassens, Inc.,* 53 F.3d 1260, 1263–64 (Fed. Cir.1995) ("Trade dress is inherently distinctive when, by its 'intrinsic nature,' it identifies the particular source of a product.") (quoting *Two Pesos,* 505 U.S. at 768, 112 S.Ct. at 2757); *Tone Bros., Inc. v. Sysco Corp.,* 28 F.3d 1192, 1206 (Fed.Cir.1994) ("the focus of the inquiry is whether or not the trade dress is of such a design that a

buyer will immediately rely on it to differentiate the product from those of competing manufacturers"), *cert. denied*, —— U.S. ——, 115 S.Ct. 1356, 131 L.Ed.2d 214 (1995).[6]

As Knitwaves' objective in the two sweater designs was primarily aesthetic, the designs were not primarily intended as source identification. Those sweater designs therefore fail to qualify for protection of trade dress inherent in product design. Accordingly, the judgment in favor of Knitwaves on the Lanham Act claim is reversed. Judgment should be entered for Lollytogs on this claim.

As set out in the following section, the significance of our decision to vacate the court's finding of a Lanham Act violation is limited; the judgment may be affirmed with only slight modification under the Copyright Act alone, with the exception of the court's award of $12,000 in lost profits under the Lanham Act.

### III. *The Effect of Vacatur of the Lanham Act Violation on the Judgment*

■ The district court, as previously noted, held that Lollytogs had willfully violated the Copyright Act, the Lanham Act, and New York unfair competition law, and it issued its injunction on the basis of each of these violations. Similarly, the court awarded attorney's fees "under the force of both the Copyright Act and the Lanham Act." Memorandum Order of August 22, 1994, at 1. Both of these remedies, accordingly, are affirmable under the Copyright Act alone, as are the court's awards of infringing profits and statutory damages, which were made under the Copyright Act alone. (Attorney's fees under the Copyright Act are addressed *infra*, in Part VI.) Only two aspects of the

judgment were ordered solely under the Lanham Act and thus must be vacated—its order, pursuant to 15 U.S.C. § 1118, that Lollytogs allow Knitwaves to verify the infringing sweaters remaining in its possession and to witness their destruction, and its award, pursuant to 15 U.S.C. § 1117, of $12,000 to Knitwaves in lost profits.

As to the order of verification of destruction, we note that the Copyright Act allows a very similar remedy: a court may, as part of a final judgment or decree, "order the destruction or other reasonable disposition" of all infringing items. 17 U.S.C. § 503(b). Thus, on remand, without reaching the Lanham Act issue, the district court may order this relief.

The court's award to Knitwaves of $12,000 in lost profits, on the other hand, is vacated and cannot be reinstated under the Copyright Act, as to do so would duplicate the recovery of infringing profits and statutory damages which Knitwaves has been awarded under that act. *See Abeshouse v. Ultragraphics, Inc.*, 754 F.2d 467, 470–71 (2d Cir. 1985) (double recovery, as prohibited by § 504(b), "may occur when an infringing seller has to disgorge profits on sales that a copyright holder might have made and for which he may therefore claim damages in the form of lost profits"); *Manufacturers Technologies, Inc. v. Cams, Inc.*, 728 F.Supp. 75, 83–84 (D.Conn.1989) (on sales where plaintiff and defendant competed directly, plaintiff may not recover both defendant's infringing profits and its own lost profits); 3 David Nimmer & Melville B. Nimmer, *Nimmer on Copyright*, § 14.01[A] (1994).[7]

---

6. We note that, in setting out this standard, we attempt to follow closely the provisions of the Lanham Act and to avoid imposing additional, nontext-based requirements, such as the requirement of secondary meaning which the Supreme Court struck down in *Two Pesos*, 505 U.S. at 772–774, 112 S.Ct. at 2759–60. Thus, while we follow the reasoning of *Duraco* on the distinction between product features and product packaging, we decline to employ the three-part test, not rooted in the language of the Lanham Act, which the Third Circuit employs. *See Duraco*, 40 F.3d at 1448–51 (requiring that, to be inherently distinctive, a product feature or configuration of features must not only be likely to serve primarily as a designator of origin, but must also be "unusual and memorable" and "conceptually separable from the product"); *cf. Stuart Hall Co. v. Ampad Corp.*, 51 F.3d 780, 787–88 (8th Cir. 1995) (rejecting the *Duraco* test as inconsistent with *Two Pesos*).

7. As to the Squirrel Cardigan claim, by electing to receive statutory damages on that claim pursuant to 17 U.S.C. § 504(c), Knitwaves has foregone the right to receive either damages or profits. *See* 17 U.S.C. § 504(a) (allowing prevailing plaintiff to elect either (1) actual damages and infringing profits or (2) statutory damages).

## IV. Non–Apportionment of Damages

 Next, Lollytogs challenges the district court's decision not to apportion its award of wrongful profits. Lollytogs contends that, since Knitwaves' copyrights extended solely to the artwork on Knitwaves' sweaters and did not extend to the skirts or pants with which the sweaters were marketed, the court erred in awarding Knitwaves the profits earned by Lollytogs on Lollytogs' entire matching sets. Instead, Lollytogs contends, the court should have apportioned Lollytogs' profits into sweater profits and profits on skirts and pants, and should have awarded Knitwaves only Lollytogs' profits on the infringing sweaters. See, e.g., Sheldon v. Metro–Goldwyn Pictures Corp., 309 U.S. 390, 402–03, 60 S.Ct. 681, 685, 84 L.Ed. 825 (1940); Orgel v. Clark Boardman Co., 301 F.2d 119, 121 (2d Cir.), cert. denied, 371 U.S. 817, 83 S.Ct. 31, 9 L.Ed.2d 58 (1962).

We review the decision of the district court only for clear error, Twin Peaks Productions v. Publications International, 996 F.2d 1366, 1382 (2d Cir.1993), Cream Records, Inc. v. Joseph Schlitz Brewing Co., 864 F.2d 668, 669 (9th Cir.1989) (per curiam), and we find none. Although Knitwaves marketed its tops and bottoms separately, Lollytogs' outfits, the district court recognized, were sold as a set. Accordingly, a customer buying a Lollytogs infringing top would have been forced to buy the matching bottom as well. We think in these circumstances it was fair to conclude, as the district court apparently did, that it was the infringing aspects of the matching sets—the appropriated sweater designs—that gave the sets their value, cf. Business Trends Analysts, Inc. v. Freedonia Group, Inc., 887 F.2d 399, 407 (2d Cir.1989), and that accordingly all profits made by Lollytogs on the sales of its matching skirts and pants were fairly attributable to Lollytogs' infringement of Knitwaves' copyrighted sweaters. See id. (burden is on infringing party to prove the portion of total profits attributable to non-infringing elements). Given this conclusion, and given the court's finding that Lollytogs' infringement was willful, we cannot say that the district court committed clear error in finding apportionment unwarranted.

## V. The Court's Finding of Willfulness

 Lollytogs challenges as well the court's finding of willfulness. As noted above, the district court found that Lollytogs' violation of the Copyright Act was willful and in bad faith, in that Lollytogs deliberately "set out to knock ... off" Knitwaves' sweaters, and succeeded in doing so. Tr. of proceedings of Sept. 1, 1992, at 2–3. The court found incredible the testimony of Lollytogs' Gindi and Laino that, working from Knitwaves' sweaters, they set out to create a new design, and that it was for this reason that they felt they did not need to consider whether or not Knitwaves' sweaters were copyrighted. The court's finding of willfulness supported both its award of enhanced statutory damages, pursuant to 17 U.S.C. § 504(c)(2), and its award of full attorney's fees. We review the court's finding of willfulness for clear error, with particular deference to determinations of witness credibility. Twin Peaks, 996 F.2d at 1382.

Lollytogs contends that, while its designers clearly used Knitwaves' sweaters as models, they intended to copy only the unprotected elements of Knitwaves' designs, and to modify the protected elements sufficiently to avoid infringement. No evidence was adduced, Lollytogs contends, to support the required finding that the "defendant had 'knowledge that its actions constitute[d] an infringement.'" N.A.S. Import Corp. v. Chenson Enterprises, Inc., 968 F.2d 250, 252 (2d Cir.1992) (quoting Fitzgerald Publishing Co. v. Baylor Publishing Co., 807 F.2d 1110, 1115 (2d Cir.1986)). Thus, Lollytogs contends, the court's finding was clear error.

 We cannot agree. To show willfulness, Knitwaves was not required to prove Lollytogs' actual knowledge that it was infringing. Knowledge of infringement may be constructive rather than actual; that is, "it need not be proven directly but may be inferred from the defendant's conduct." Id. at 252. "[R]eckless disregard of the copyright holder's rights ... suffices to warrant award of the enhanced damages." Id. (quoting RCA/Ariola Int'l, Inc. v. Thomas & Grayston Co., 845 F.2d 773, 779 (8th Cir.

1988)); *see also Twin Peaks,* 996 F.2d at 1382.

In challenging the district court's finding of willfulness, Lollytogs relies entirely on the testimony of Gindi and Laino, which the district court expressly rejected as incredible. Given the court's credibility determination and the other evidence—in particular, Lollytogs' admission that it set out to create designs having the same "look" and "feel" as Knitwaves' sweaters, its admission that it did not look for copyright notices on the sweaters, and the lack of original artwork by Lollytogs—it was not clearly erroneous for the district court to conclude that Lollytogs, if it did not willfully set out to appropriate Knitwaves' protected designs, at least acted recklessly in disregarding Knitwaves' copyrights. *Cf. Twin Peaks,* 996 F.2d at 1382 (affirming a finding of willfulness where defendant publisher knew of plaintiff's copyright but contended that it copied in the belief that it was engaging in fair use); *N.A.S. Import Corp.,* 968 F.2d at 253 (similarity of buckle design, in conjunction with close proximity of plaintiff's and defendant's stores, strongly supported finding of knowing appropriation); *Fitzgerald Publishing Co.,* 807 F.2d at 1115 (defendant's position as an experienced publisher gave it constructive knowledge of its infringement).

## VI. *Attorney's Fees*

Lollytogs contends, finally, that the district court abused its discretion in awarding $143,460.52 in costs and attorney's fees to Knitwaves. The award, constituting the full amount of fees and costs billed by Knitwaves' counsel ($136,012.50 in attorney's fees and $7,448.02 in costs), was issued pursuant to both the Copyright Act and the Lanham Act, the court having found Lollytogs' two acts of infringement to be willful and in bad faith.

Lollytogs challenges the award on several grounds, of which we consider three. First, it contends, the award was unreasonably large in relation to Knitwaves' monetary damages of approximately $50,000 ($12,000 of which we have vacated). Second, it contends that, since Knitwaves obtained copyright registration for its Leaf Sweater design only after Lollytogs had begun its infringing activities, the fee award should be reduced pursuant to 17 U.S.C. § 412 to subtract the percentage of time spent by Knitwaves' counsel on the Leaf Sweater claim. Third, it challenges whatever portion of the fee award can be considered to have been awarded under the Lanham Act. We find the second and third of these contentions meritorious, and we remand for redetermination of the fee award in light of these errors and in light of the Supreme Court's decision in *Fogerty v. Fantasy, Inc.,* — U.S. —, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994), which changed the standard in this circuit for determination of fee awards under the Copyright Act.

17 U.S.C. § 505 provides that, in any copyright infringement action, the court "in its discretion may allow the recovery of full costs by or against any party ... [and] may also award a reasonable attorney's fee to the prevailing party as part of the costs." Prior to the Supreme Court's *Fogerty* decision, this circuit awarded attorney's fees to prevailing plaintiffs (but not to prevailing defendants) as a matter of course, on the ground that the Copyright Act "is designed to encourage plaintiffs to act to protect their copyrights." *In Design v. K–Mart Apparel Corp.,* 13 F.3d 559, 567 (2d Cir.1994). In *Fogerty,* however, the Court rejected this "dual" approach, holding that prevailing plaintiffs and prevailing defendants must be treated alike for purposes of attorney's fee awards. — U.S. at —, 114 S.Ct. at 1033. Attorney's fees are not to be awarded automatically to a prevailing party, the Court held, but "only as a matter of the court's discretion." *Id.* The Court noted that "[s]ome courts ... have suggested several nonexclusive factors" which "may be used to guide courts' discretion, so long as such factors are faithful to the purposes of the Copyright Act and are applied to prevailing plaintiffs and defendants in an evenhanded manner." *Id.* at — n. 19, 114 S.Ct. at 1033 n. 19. These factors include:

> "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence."

*Id.* (quoting *Lieb v. Topstone Indus., Inc.,* 788 F.2d 151, 156 (3d Cir.1986)). We may reverse an award of attorney's fees only if the district court applied the wrong legal standard, *id.* at ——, 114 S.Ct. at 1033, or abused its discretion, *In Design,* 13 F.3d at 567.

It is unclear from the district court's June 1, 1994, order (issued three months after *Fogerty* ) whether it employed the *Fogerty* "evenhanded" standard or the pre-*Fogerty* "dual" standard in deciding to award attorney's fees to Knitwaves. Certainly the court's award of more than $135,000, representing the full billing rate of plaintiff's counsel, is large in proportion to the monetary damages of approximately $50,000—and proportionately even larger once we have vacated $12,000 of the damage award. *See* 3 *Nimmer, supra,* § 14.10[C]. On the other hand, the size of the fee award (as the court's subsequent order of August 22, 1994, noted) reflects the court's finding of Lollytogs' willfulness and bad faith. Since a remand is required for the additional reasons set out below, we need not speculate as to what standard the court employed, but instead direct that on remand the court exercise its discretion in light of the analysis set forth in *Fogerty.*

■ As noted above, Lollytogs is correct in its second challenge to the fee award. 17 U.S.C. § 412 precludes an award of attorney's fees for any act of infringement commenced prior to the effective date of registration of the asserted copyright. *See* 17 U.S.C. § 412(2). This precludes Knitwaves from obtaining attorney's fees for its counsel's work on the Leaf Sweater infringement claim. As Knitwaves acknowledges, registration for that sweater was not obtained until May 13, 1992, after the start of Lollytogs' infringing activity. (Indeed, Knitwaves declined the court's offer of statutory damages for the Leaf Sweater infringement on this ground, since § 412 precludes an award of statutory damages as well as attorney's fees for late-registered items.) Accordingly, we vacate the award of attorney's fees so that, on remand, the court may determine what percentage of work by Knitwaves' counsel was devoted to the Leaf Sweater infringe-ment claim, and reduce its award by that percentage.

■ Finally, taking up Lollytogs' third challenge to the fee award, we vacate the award to the extent that Knitwaves' costs and attorney's fees reflect prosecution of its Lanham Act claim. *See Twin Peaks,* 996 F.2d at 1383.

In sum, we vacate the court's award of costs and attorney's fees to the extent that those costs and fees reflect prosecution of either the Leaf Sweater claim or the Lanham Act claim. We remand so that the court may reduce its award by an appropriate amount and, if it did not do so before, exercise its discretion regarding the appropriate award under the standard set out in *Fogerty.*

### VII. *Knitwaves' Cross–Appeal*

■ Knitwaves contends on cross-appeal that the district court abused its discretion by failing to award statutory damages in an amount larger than $25,000 per infringement and by failing to enhance its award of damages and profits under the Lanham Act. Knitwaves' contention under the Lanham Act is, of course, moot in light of our vacatur of the court's finding of Lanham Act liability. As to the court's award of statutory damages under the Copyright Act, we do not think the court abused its discretion in finding $25,000 to be an appropriate amount of statutory damages, *see N.A.S. Import Corp.,* 968 F.2d at 253 (decision whether to enhance award of statutory damages in light of defendant's willfulness is within court's discretion), and accordingly we affirm.

### CONCLUSION

We affirm the district court's decision as to copyright liability, vacate the district court's decision as to Lanham Act liability, affirm the award of $13,221.20 in infringing profits and of $25,000 in statutory damages, vacate the award of $12,000 in lost profits, vacate the award of $143,460.52 in attorney's fees and costs, affirm the permanent injunction, and vacate the order allowing Knitwaves to verify Lollytogs' remaining infringing goods and witness their destruction. The matter is

remanded for further proceedings consistent with this opinion.

Affirmed in part, vacated in part, and remanded.

[Appendices follow on pages 1014–1017.]

APPENDIX

EX. 1: KNITWAVES' LEAF SWEATER

**EX. 3: KNITWAVES' SQUIRREL SWEATER**

EX. 5: LOLLYTOGS' LEAF SWEATER

EX. 6: LOLLYTOGS' SQUIRREL SWEATER