JUDITH RIPKA DESIGNS,
LTD., Plaintiff,

v.

Penny PREVILLE, Lisa Horowitz, Norman Landsberg, Sheri Miller, HWR Jewelers, Jeffrey Robert, Ltd., Jeffrey Stevens, Two Carols, 14 KT, the House of Clasps, Inc., Michael Eigen, Laviano Jewelers, Julius Oxenhorn Jewelers, Robert Fabrikant, Inc., Shine Jewelry, On Broadway, Golden Touch, Nancy and David, J.R. Gold Designs, Ltd., Rose Jewelers, Lux Bond & Green, Gold N' Gems, and Does 1 Through 20, Defendants.

No. 95 Civ. 1134 (RPD).

United States District Court,
S.D. New York.

Jan. 26, 1996.

Littman & Krooks, P.C., New York City by Richard Roth, for Plaintiff Judith Ripka Designs, Ltd.

Herrick, Feinstein L.L.P., New York City by Barry Werbin, Darlene Fairman, and Mark D. Mermel, for Defendants Penny Preville, Inc. and HWR Jewelry, Inc.

OPINION AND ORDER:

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

ROBERT P. PATTERSON, Jr., District Judge.

Plaintiff Judith Ripka Designs, Ltd. ("Ripka Designs") brings this action for (1) copyright infringement pursuant to 17 U.S.C. §§ 106, 113, 501; (2) trade dress infringement pursuant to 15 U.S.C. § 1125(a); (3) injury to business reputation and dilution under New York General Business Law ("N.Y.Gen.Bus.L.") § 368–d; (4) deceptive trade practices under N.Y.Gen.Bus.L. § 133; and (5) New York common law unfair competition. Plaintiff seeks injunctive relief and monetary damages, including punitive and compensatory damages. A consolidated trial of the request for preliminary and final injunctive relief was held before the Court from May 22, 1995 to June 2, 1995, pursuant

to Rule 65(a)(2) of the Federal Rules of Civil Procedure.

## Background

By a Complaint and Order to Show Cause filed on February 16, 1995, Plaintiff originally sought to enjoin Defendant Preville from designing, manufacturing, or selling twenty pieces of jewelry alleged to infringe Plaintiff's copyrights for similar pieces of jewelry. A hearing on Plaintiff's motion for a Temporary Restraining Order was held on February 22, 1995 and an order was entered temporarily restraining Defendant Preville from designing, manufacturing, or selling pieces of jewelry alleged to infringe copyrights for six of Plaintiff's pieces, reflected in Exhibits A, C, E, G, I, and K to Plaintiff's Complaint (Trial Exhibits ["Ex."] 1–5 and a piece which was not introduced at trial). Plaintiff amended its Complaint to allege a cause of action under the Lanham Act. On or about March 27, 1995, Preville and Defendant HWR, a retail jewelry store that sells Preville jewelry in Aspen, Colorado, filed an answer to the Amended Complaint and on or about April 12, 1995, filed an Amended Answer as of right. To date, Plaintiff has not served the other Defendants.

Pursuant to Court Order during discovery, Preville produced its entire line of jewelry for inspection and photocopying. Plaintiff was ordered to produce its entire line of about 250 pieces simultaneously, but produced only fifteen pieces of jewelry at the initial inspection on March 21, 1995. After Plaintiff's principals had an opportunity to examine and photograph Preville's entire line, Plaintiff claimed that additional Preville pieces infringed Plaintiff's copyrights on individual pieces of jewelry; it did not, however, produce the items for inspection and photocopying until some weeks later. Plaintiff never made its entire line, which allegedly numbers a couple of hundred pieces, available for inspection. (Tr. at 941.) Only five of the twenty pieces which Plaintiff originally alleged had been infringed by Preville remain in the case. (Ex. 1–5)[1] Shortly before trial, Plaintiff was permitted to add fourteen new pieces (Ex. 9–22) and substitute two new items of its jewelry (Ex. 6, 8B) as allegedly infringed by two of Defendant's items (Exhibits F and H to the Amended Complaint) which it originally claimed had been infringed by other items. (Ex. K, V)

Plaintiff Judith Ripka Designs, Ltd. is a New York corporation. Judith Ripka is a principal and employee of Plaintiff. Ms. Ripka began designing and selling jewelry at her home in approximately 1970. (Tr. at 40–41.) In the 1970's, Ms. Ripka sold jewelry from her office at 10 West 47th Street. (Tr. at 43.) Ripka participated in jewelry trade shows in the late 1970's and early 1980's, but did not appear in trade shows between the early 1980's and June 1995. (Tr. at 47–49.) The evidence showed that Ms. Ripka designed individual pieces for individual customers; Ms. Ripka often referred to pieces by customers' names.[2] At the time this action was commenced, Plaintiff had begun efforts to expand its business from direct retail sales into the wholesale jewelry market. (Tr. at 432.) Preville has operated in the wholesale market since 1978.

In the early 1980's, Plaintiff opened a jewelry concession at a women's clothing boutique called Tango in Roslyn, New York (Tr. at 50–51); it maintained that concession until 1991. Only a few pieces of jewelry were displayed at Tango (Tr. at 51), but a book of magazine pictures of other designers' jewelry, such as Bulgari, Barry Kisselstein–Cord and Elsa Peretti was available; customers could choose a piece for which Ms. Ripka would provide her own "interpretation." (Tr. at 1544–45, 1816–17.) In the late 1980's, Plaintiff opened a second concession at a shoe store in Plainview, New York. (Tr. at 55–56.) Subsequently, Plaintiff opened another concession in Wheatley Plaza, New York, in the late 1980's or early 1990's. (Tr. at 56–57.) The concessions at the Long Is-

---

1. Plaintiff's failure at the original inspection session to identify and produce for photocopying items for which it now claims infringement raises questions as to whether these items, and particularly Plaintiff's Exhibits 6 and 8B, were created after the action commenced.

2. Evidence that many of Plaintiff's designs were made to order for specific customers tends to rebut Plaintiff's contention that it has a set "line" of jewelry.

land shoe stores were closed in 1993. (Tr. at 942.) In approximately 1991, Plaintiff moved its office to 21 West 46th Street. (Tr. at 91.) In 1991, Plaintiff closed its concession at Tango and opened a concession at Hirshleifers shopping center in Manhasset, New York. (Tr. at 60–61.) In 1993, Plaintiff closed its concession at Hirshleifers and opened a store called "Judith Ripka" in Manhasset. (Tr. at 62.)

In 1991, Plaintiff sold jewelry at Henri Bendel. (Tr. at 58.) This ceased after one year. Plaintiff then began selling jewelry at Neiman–Marcus, which it continues to do outside of New York. (Tr. at 59.) Ms. Ripka asserted at pretrial proceedings that samples of her infringed jewelry could be obtained from stock at Neiman–Marcus. Despite requests for production, no samples were produced from Neiman–Marcus and at trial Plaintiff offered no documentary evidence to demonstrate that any of the pieces in issue ever were displayed or sold by Neiman–Marcus or Henri Bendel.

In July and November 1994, respectively, Plaintiff opened concessions in a shoe store at 1100 Madison Avenue in Manhattan and a boutique in Aspen, Colorado. (Tr. at 65–66.) The Aspen boutique is located across the street from an existing store maintained by HWR Jewelry. (Tr. at 1021.)

In an affidavit supporting Plaintiff's motion for temporary and preliminary injunctive relief, sworn to on February 16, 1995, Ms. Ripka alleged that if the copying continued, Plaintiff would be forced to close its Manhattan store "to keep pace with Preville's predatory practices." (Tr. at 278.) At trial, Ms. Ripka acknowledged that she meant to refer to Plaintiff's "Manhasset" store (Tr. at 278), which, she testified, yielded gross sales of over $3 million in 1994 alone, an amount which exceeded gross sales in prior years. (Tr. at 495.) When asked by the Court for the basis of the allegation that Plaintiff had lost over one million dollars in the two years prior to commencing this action, Ms. Ripka testified that this number was based not on actual losses of Plaintiff, but on the perception that "a lot of" business going to Preville should have been going to Plaintiff. (Tr. at 495–96.)

Defendant Preville is a New York corporation which was organized in 1990. (Tr. at 960.) From 1975 until 1990, Preville did business as a husband and wife partnership. (Tr. at 960.) Mr. Jay Siskin is the President of Preville. (Tr. at 960.) Ms. Penny Preville Siskin is a Vice President of Preville. (Tr. at 863.) Ms. Siskin has always been the primary jewelry designer at Preville. (Tr. at 966–67.) In 1993, Ms. Leslie Greenberg purchased a 50% interest in Preville and became a Vice President. (Tr. at 963.)

In 1975, Preville began operating out of the Siskins' apartment in Manhattan. (Tr. at 961.) In the late 1970's, Preville opened an office at 19 West 44th Street in Manhattan. (Tr. at 961.) The Preville office remained at 44th Street until June 1990, when the Siskins moved their business to 445 Northern Boulevard in Great Neck, New York, where they have lived since 1978. (Tr. at 961.) In 1994, Preville moved to 111 Great Neck Road in Great Neck. (Tr. at 962.) Preville currently employs three people in addition to its three principals. (Tr. at 964.) From 1989 to 1994, Preville employed an in-house model maker, jeweler and polisher, Zvi Keren. (Tr. at 1043.) Mr. Siskin is also a jeweler. (Tr. at 966.) Since 1993, Preville also has contracted some of its model making to Juan Merchan at Sumer Gold, Inc. (Tr. at 1044.) Mr. Keren was the model maker and jeweler for Exhibits A, R, T and 12G; Mr. Merchan was the model maker and jeweler for Exhibits B, C, D, E, F, G, H1, H2, I, J, K, L, M, N, O, P, Q, and S.

Preville designs, manufactures and sells its jewelry to over 200 retail stores throughout the United States, Canada, Mexico, the Caribbean, and South America. (Tr. at 968–69.) Preville has previously sold to department stores such as Macy's, Saks Fifth Avenue, Bergdorf Goodman, Neiman–Marcus and Nordstrom's. At the time of trial, Preville was preparing to open a display case in Bloomingdale's. (Tr. at 969.) Preville sells a small percentage of its jewelry (approximately ten percent) directly to family and friends, (Tr. at 971), but maintains no stores for the sale of jewelry. Preville has been appearing at trade shows regularly since at least 1978. (Tr. at 969.)

Preville has been featured in various jewelry industry editorials (Tr. at 1029–32, 1034–35; Ex. WWW, XXX and YYY). In 1978, Preville won the New Designer of the Year Award at the Jewelers of America ("JA") trade show. (Tr. at 1038–39.) Since at least 1990, Preville has been followed by Modern Jewelry Magazine as one of twelve designers setting trends in the jewelry industry. (Tr. at 1719–20.) Preville's gross sales in 1994 were approximately $2 million. Of this amount, Exhibits A through T, Preville's jewelry at issue, accounted for under ten percent of total dollar sales. (Tr. at 974.)

Preville has advertised in trade publications and trade show directories for the past eight to ten years, including Jeweler's Circular Keystone ("JCK") and Jeweler's Quarterly ("JQ Magazine") (Tr. at 1011.) Preville has advertised its jewelry in consumer magazines, such as Town and Country, Vanity Fair, Architectural Digest, Gourmet, American Express' Departures Magazine, Destinations Magazine (distributed by United Airlines on its Denver to Aspen route), the New York Times Magazine Section, the Long Island section of the New York Times, and cooperatively with its retail store customers in regional, local advertising (Tr. at 1012, 1028.) It has advertised in nationally distributed magazines for the past two or three years. (Tr. at 1012.)

Preville's offering of jewelry undergoes substantial changes in response to suggestions from trade customers at annual trade shows. Its current line of jewelry includes between 250 and 275 pieces of 18 karat gold jewelry and some silver pieces. (Tr. at 983.) Preville's President testified that the line contains multiple collections or subcollections. The Preville jewelry identified by Plaintiff as infringing is not a collection or subcollection; it is a selection of pieces from as many as ten different collections. (Tr. at 976–83.) Mr. Scott LaDu, a former employee of HWR Jewelry in Aspen, Colorado, confirmed that the allegedly infringing pieces are not sold or displayed as a collection. (Tr. at 1237.) Nearly all of the pieces in Preville's line feature a matte-highlighted finish. (Tr. at 991.)

### The Subject Matter of the Case

The jewelry which is the subject matter of this litigation is high-end, designer, 18 karat gold jewelry. Many pieces incorporate unfaceted precious and semi-precious stones referred to as "cabochons". The pieces range in wholesale price from approximately $500 to $5,000.

The jewelry falls within a genre known as "ancient inspired" (Tr. at 1724), which has been in vogue since at least 1988. (Tr. at 1783–84.) The jewelry designs of Ripka and Preville incorporate common elements of the ancient inspired genre, including the use of 18 karat green colored gold, matte finishes, beading, granulation, rope twists, fluting, cabochon stones, columnar designs, pyramid designs and art deco design. (Tr. at 1724.) These elements have been used by designers for a long time. (Tr. at 1515.) Both Plaintiff and Defendant use mabe pearls and semi precious stones which are pre-shaped and purchased in bulk from suppliers. Other designers of ancient inspired jewelry include Jamms, SeidenGang, Trompe L'Oeil and Barry Kisselstein–Cord. (Tr. at 1725–26.)

The jewelry of Plaintiff, Defendant, and other designers of ancient inspired jewelry share common functional elements. Each designer frequently uses toggle bars and rings as clasps. (Tr. at 79, 1515.) Mystery clasps used by both designers have been used for at least 30 years. (Tr. at 1530.) Each designer uses gold caps which must be of a certain size and shape to attach to pearls and mystery clasps. Pearl caps have been used for at least 70 years; they are also functional. (Tr. at 1535.) Plaintiff admits that screw in pearl caps are in the public domain. (Tr. at 771–72.) Both Plaintiff and Defendant use clip mechanisms to create jewelry to attach to chains and pearls. Designers have been making clip-on jewelry for many years. (Tr. at 1784.)

The convertible jewelry [3] designed by both parties is currently a popular form of design-

---

3. "Convertible jewelry" refers to pieces which can be worn in numerous ways. Designers at-

tach combinations of gold to pearls using beads or rondels and links, or create one or more gold

er jewelry. (Tr. at 1775–76.) Samuel Beizer also testified that he had designed jewelry over 25 years ago attaching several sections of gold (such as rondels or beads linked together) to pearls using mystery clasps. (Tr. at 1536–40.)

Plaintiff uses a dull or matte finish on its 18 karat gold jewelry. Defendant uses a matte finish and highly polished highlights. Mr. LaDu testified to the uniform use of the matte-highlighted combination by Defendant. (Tr. at 1229.) In addition, Preville's earring collection, marked for identification as Defendant's Exhibit YY, showed Defendant's use of the matte-highlighted finish. Photographs of certain of Plaintiff's and Defendant's pieces taken side by side at the inspection confirm this as well. (Tr. at 797–803; Ex. PP, QQ, RR, SS, TT, UU and VV.) [4]

Ms. Ripka admitted that the green gold color of her jewelry has "[b]een around for ages and ages in various forms ... Other people, I am sure, used it and have used it for many, many centuries." (Tr. at 69.) Green gold is generally used by designers in the ancient inspired genre, including Preville. (Tr. at 1046.)

In response to questioning by the Court, Ms. Ripka testified that her jewelry was unique primarily because of its color, the type of fluting and beading used, and its functional features including the "clip-in/clip-out" and "screw-in/screw-out" elements:

The Court: What are the features that you combine that make them unique?

The Witness: I am not going to be long. The total picture is that everything kind of goes with everything.

The Court: What is the combination of features?

The Witness: The combination of the features are where I apply everything to my pieces. It's thought out. It connects from one piece to the next. . . .

The Court: The question has to do with the uniform look. Give me the features.

What are the combination of features which give it a uniform look?

The Witness: The color of the gold, the type of fluting, the beads. The design of the piece itself to me would be the most important feature because the thought comes first and then when it's presented into gold it's the way it's done for me. The placement are [sic] the features to me, a big part of the features. The clip-in/clip-out part are a big part of the features which are not part of this—it's part of this board but not part of the case.

The Court: What are the features?

The Witness: That they clip in, clip out. So you can take a necklace and wear it with pearls, wear it with leathers, wear it with beads, wear an all-gold necklace. So you change the centers and you change the back part of it. So the necklace becomes daytime, afternoon, evening, because you can make the center very dressy with an all-gold-and-diamond necklace and for daytime you can clip in something that is not so dressy in the front, a carving, and then you can clip leather into it. And the same with the pearls. You can screw leather into the pearls. You can screw every color type of bead, lapis, malachite, anything you can think of, citrine beads, so on and so forth, into the pearls so they can again become totally different. A feature to me is that you can change the same piece of jewelry and wear it at different times of the day or evening or if you are in a different mood.

(Tr. at 404–06.)

Plaintiff's expert, Joyce Jonas, acknowledged that "everyone" in the industry was designing jewelry with a similar look as plaintiff's pieces in issue:

Q: In reviewing these magazines and the catalog, did you see any other manufacturer who captures the look of Judith Ripka?

A: I mean, everybody is doing it now. It's all over the place.

---

necklaces that can also be worn as a bracelet and in combination with pearls or leather.

**4.** Ms. Ripka's claim that at the joint inspection ordered by the Court the Preville jewelry had

been polished to differentiate it is found to be false as demonstrated by the appearance of Defendant's jewelry in Exhibit F to Plaintiff's Complaint filed months before the joint inspection.

Q: Any other manufacturers just copy a line of the jewelry?

A: Any other manufacturer?

The Court: What do you mean, "it's all over the place?"

The Witness: Everybody is doing this look now.

The Court: I see.

The Witness: Everybody is designing jewelry that looks like this.

The Court: What do you mean "everybody?"

The Witness: I must have seen illustrations that were submitted to me by the defendants of 20 jewelers who were working in a similar style today making jewelry in 1994 in this very similar look.

(Tr. at 869.) Ms. Jonas also admitted that the design elements, themes and motifs used by both Plaintiff and Preville "have been around forever and the beading and the motif and the twist work and even the mystery clasp and the whole idea of a wardrobe, all of that. Nothing is new. All of those have been used before and both were using them." (Tr. at 832.)

Ms. Jonas confirmed that most high-end jewelry designers design in collections. (Tr. at 877.) Prospective purchasers of jewelry scrutinize pieces of high-end jewelry they are considering buying carefully. (Tr. at 895.)

Plaintiff submitted advertisements picturing pieces of its jewelry, dating from December 1993 through February 1995 (Ex. 29–36, 39–41, 42A, 43–44, 46, 48–50, 54 and 58). Most of these advertisements feature jewelry designs that are not the subject of this litigation. Two advertisements in evidence portray pieces at issue in this litigation. Plaintiff's Exhibit 34 is an advertisement from the New York Times, dated November 27, 1994, which shows Plaintiff's Exhibit 10, Plaintiff's Exhibit 7 as two bracelets, and two necklaces that appear to be versions of Exhibit 1, but contain either extra links instead of pearls or different end caps. Plaintiff's Exhibit 50, a Neiman–Marcus Christmas catalogue issued in or about November 1994, features Plaintiff's Exhibits 10 and 7. (Tr. at 403, 413–14.)

Although Ms. Ripka was recalled to testify that a passerby can see jewelry in a window display in her Manhasset store (Tr. at 386), David Ripka, Plaintiff's officer who signed many of its copyright registrations in evidence, testified at his April 11, 1995 deposition:

Q: If I'm walking down the street and I stop in front of the store and I don't go in, are there any pieces of jewelry in a window that I can see?

A: No.

Q: Would I have to go into the store physically to actually see any pieces of jewelry?

A: Yes.

Q: Is there a display inside the store under glass?

A: That is where the jewelry is displayed.

Q: Have you ever been to that store?

A: Yes.

Q: Is the door to that store kept locked except to let customers or people in?

A: Yes.

Q: Does someone have to ring a bell to get into the store?

A: Yes.

(Tr. at 1807–08.)

Ms. Ripka was in Aspen, Colorado in August 1994, negotiating a lease for a jewelry showcase that opened in a gallery in November 1994. The gallery is located across the street from HWR Jewelry. Ms. Ripka testified that in either August or December 1994, she saw a piece of Preville jewelry that looked like Plaintiff's Exhibit 2 in HWR's window. (Tr. at 445–46.) Although Ms. Ripka testified that she did not go into the HWR store (Tr. at 445), she did not identify other pieces in the window as substantially similar to pieces of hers. According to the testimony of Mr. LaDu, who managed HWR from May 1994 through March 1995, Preville jewelry at issue in this case was displayed in HWR's window with a plaque with Preville's name on it prior to the opening of Plaintiff's showcase in Aspen. Specifically, Mr. LaDu testified that Preville's Exhibits B, D, E and P were displayed in HWR's window during this period and that Exhibits H1, G and O may have been displayed as well. Other Preville pieces were displayed with these

pieces, both in the window and in a showcase inside HWR. (Tr. at 1222–24.)

Specific pieces of Preville's jewelry in issue, namely Exhibits B and H2, appeared in an advertisement in the May/June 1994 and July/August 1994 issues of JQ trade magazine. (Ex. NNN, RRR) An advertisement featuring Preville's Exhibit G appeared in the January/February 1994 issue of JQ magazine. (Ex. OOO) Preville Exhibit P was featured in an advertisement by HWR in the Summer 1994 Aspen Catalogue issued in late Spring 1994. (Ex. UUU) Preville Exhibits B, D and E were advertised in the September/October 1994 issue of JQ magazine (Ex. OO), which was issued in August 1994. Preville Exhibits B, D, E and O were advertised in the November 1994 issue of Town and Country (Ex. SSS), which was issued in September 1994. (Tr. at 1014–28.) This action was not commenced until February 16, 1995.

Ms. Ripka's deposition testimony of March 23, 1995 and her affidavit of February 16, 1995 provide the only example of any instance where a customer—Mrs. Muriel Horowitz—refused to purchase Plaintiff's jewelry because it could be purchased "cheaper" from Preville.[5] (Ex. U) At trial, Mrs. Horowitz denied that she ever stated she could purchase less expensive jewelry that looked like Plaintiff's from Preville. Mrs. Horowitz testified that she had never heard of Preville until she had been contacted by one of Preville's attorneys after this action was commenced and that she never has been to Preville's showroom. (Tr. at 237–45.) She also denied a suggestion that she was rude to Ms. Ripka at a luncheon in the Spring of 1994. (Tr. at 243.) Mrs. Horowitz also testified she had purchased two pieces of Plaintiff's jewelry in the fall of 1994 (Tr. at 240), contrary to Ms. Ripka's sworn statement that she had purchased only one necklace.

Mr. LaDu also denied statements attributed to him by Plaintiff's employee Gail Franklin, who Plaintiff did not call to testify at trial. Ms. Franklin alleged in her deposition testimony (Ex. ZZZ) and in her affidavit, sworn to on February 9, 1995, that Mr. LaDu said Preville made copies of Judith Ripka jewelry. (Tr. at 1224–25, 1228.) The Court accepts the contradictory testimony of Mr. LaDu, a former employee of HWR who came from Aspen, Colorado and testified in Court in an open and direct manner.

Plaintiff filed its first applications for copyright in December, 1994. Its other applications were filed in late March and early April of 1995, after the initiation of this action; those applications claim dates of first publication by month and year but not by date.

At trial, the testimony of Judith Ripka, Plaintiff's President and principal witness, was characterized by long pauses on direct and cross examination. She was not a credible witness. Ms. Siskin's deposition and trial testimony about the source of her inspiration for her designs was not very credible. The Court is dubious that testimony as to source of inspiration of design can usually be effectively weighed at trial. Ms. Greenberg's testimony about her knowledge of her husband's legal problems was not credible but not directly relevant to the issues in this trial. Plaintiff's lack of inventory records, books of account, sales records and invoices clearly documenting Plaintiff's business and the sales of the Exhibits at issue in this litigation was very troubling, particularly for a business in which one store allegedly had gross sales of $3 million in 1994 and inventory control of relatively valuable stock would be important.[6] Throughout discovery, Plaintiff also withheld evidence of customers' names at the store from which sales were made, thus denying evidence of the manner in which her business was conducted and corroboration of her oral testimony.

---

5. At trial, two documents were inadvertently marked and admitted as Defendant's Exhibit U, namely Ms. Ripka's referenced deposition testimony (Tr. at 236) and a document dated April 17, 1993, referencing a "Hermès beaded link." (Tr. at 661–63.)

6. Ms. Candi Kolen, an employee of Plaintiff since 1990, testified that certain documents, which had been stored in a warehouse where her husband works, were "inadvertently ... thrown out." (Tr. at 937.) Ms. Kolen's testimony, however, does not explain Plaintiff's inability to produce business records maintained by the manufacturer or from any other source.

## Discussion

### I. Copyright Infringement

■ To prevail on a claim of copyright infringement, a plaintiff must show valid ownership of a copyright and unauthorized copying by the defendant.[7] *See e. g. Rogers v. Koons,* 960 F.2d 301, 306 (2d Cir.1992), *cert. denied,* 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992); *Stillman v. Leo Burnett Co. Inc.,* 720 F.Supp. 1353, 1358 (N.D.Ill. 1989). The *Stillman* court provided the following explanation:

> To prevail on a copyright claim, a plaintiff must prove (1) a valid copyright, and (2) illicit copying. To prove illicit copying, he must establish both (1) copying, and (2) unlawful appropriation ... To establish copying, a plaintiff must show (1) access, and (2) substantial similarity between the works 'when compared in their entirety including both protectible and unprotectible material' ... Finally, to show unlawful appropriation (i.e. substantial similarity as a matter of law), the plaintiff must demonstrate that the defendant's copying extended to the plaintiff's protectible expression.

*Stillman,* 720 F.Supp. at 1358.

■ To prove actionable copying, a plaintiff must first show that her work was actually copied. A court may infer copying in the absence of direct evidence if the plaintiff demonstrates (a) substantial similarities between the two works; and (b) that the defendant had access to the copyrighted work. *Laureyssens v. Idea Group, Inc.,* 964 F.2d 131, 140 (2d Cir.1992). In the determi-nation of whether actual copying occurred, "substantial similarity" means similarity between protected and unprotected elements of the work being considered. Access may be inferred when a defendant had a reasonable opportunity to view the plaintiff's work before creating its own. *See Gaste v. Kaiser-man,* 863 F.2d 1061, 1066–67 (2d Cir.1988); *see also ABKCO Music, Inc. v. Harrisongs Music, Ltd.,* 722 F.2d 988, 998 (2d Cir.1983).[8] Access may be established if a copyrighted work has been published, or evidence is introduced showing that "a third party with whom both the plaintiff and the defendant were dealing had possession of plaintiff's work." 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 13.02(A) 17–18 (1990). Access may also be inferred if the article alleged to infringe is strikingly similar to the copyrighted piece. Limited distribution of a copyrighted item may not be sufficient to support a finding of access. *See, e.g., Selle v. Gibb,* 741 F.2d 896 (7th Cir.1984) (Court found plaintiff's song which was the subject of a copyright action was not published where the extent of dissemination was that plaintiff "played his song with his small band two or three times in the Chicago area and sent a tape and lead sheet of the music to eleven music recording and publishing companies. Eight of the companies returned the materials to [the plaintiff]; three did not respond." *Id.* at 898.)[9] Here, Plaintiff has not shown "distribution of copies" of its creations. Instead, the evidence suggests that each individual creation was designed for and sold to an individual.

7. Defendant apparently does not contest Plaintiff's ownership of valid copyrights in its works, although many of the registrations were made after this action commenced. Defendant does, however, contest dates of first publication and creation.

8. For pieces for which Plaintiff has copyright registration certificates, 17 U.S.C. § 410(c) states that:

> In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate.

According to the language of the statute, the dates listed by Plaintiff as "Date of First Publica-tion" on the copyright registration certificate must be accorded some weight. However, the diminished credibility of Plaintiff's principal Judith Ripka on the stand, manner of doing business, failure to register the majority of its pieces for which it claimed copyright protection until after the commencement of this litigation and the initial Court Ordered inspection and failure to corroborate these dates with any evidence, such as regular business records, affects the statutory weight to be accorded to the dates provided by Plaintiff within the registration certificates.

9. 17 U.S.C. § 101 defines publication as "the distribution of copies ... of a work to the public by sale or other transfer of ownership." The definition goes on to note that "a public performance or display of a work does not of itself constitute publication." 17 U.S.C. § 101.

■ A court must also determine whether the alleged copying constituted infringement. To prove infringement, a plaintiff must demonstrate substantial similarity between protected elements of its work and the work of the defendant. *See Laureyssens,* 964 F.2d at 141; *see also Reyher v. Children's Television Workshop,* 533 F.2d 87, 90 (2d Cir.1976), *cert. denied,* 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976). The Second Circuit recently provided insight into the meaning of "substantial similarity" in determining infringement in *Knitwaves, Inc. v. Lollytogs, Ltd. (Inc.) d/b/a French Toast,* 71 F.3d 996 (2d Cir.1995), a case concerning copyright protection for fabric design. The court in *Knitwaves,* like this Court, compared products containing both protectible and unprotectible elements. In such a case, the *Knitwaves* court explained,

> our inspection must be "more discerning"; we must attempt to extract the unprotectible elements from our consideration and ask whether the protectible elements, standing alone, are substantially similar.

*Knitwaves, Inc.,* 71 F.3d at 1002. Discussing the meaning of "substantial similarity" in this context, the court explained that "[w]hat is protectible ... is 'the author's original contributions,' ... the original way in which the author has 'selected, coordinated, and arranged' the elements of his or her work." *Knitwaves, Inc.,* at 1004 (citations omitted).

■ The defendant may overcome the inference of copying, despite a showing of access and substantial similarity, by providing evidence of independent creation. If, however, the parties' works are so strikingly similar as to preclude the possibility of independent creation, copying may be proved by substantial similarity alone without a showing of access. *See Gaste v. Kaiserman,* 863 F.2d at 1067–68; *Arnstein v. Porter,* 154 F.2d 464, 468 (2d Cir.1946).

■ Copyright protection does not extend to functional elements of Plaintiff's jewelry, such as the use of toggle bar and ring closures and rondels which unscrew and attach to pearls. The elements are in common use by many designers of necklaces and bracelets. Furthermore, copyright protection extends to expressions of an idea, not to the idea itself. *See, e.g., Mazer v. Stein,* 347 U.S. 201, 217, 74 S.Ct. 460, 470, 98 L.Ed. 630 (1954); *Herbert Rosenthal Jewelry Corp. v. Honora Jewelry Co.,* 378 F.Supp. 485 (S.D.N.Y.), *aff'd,* 509 F.2d 64 (2d Cir.1974). Accordingly, "[i]f a defendant has not copied something protected by the copyright laws—specifically, the plaintiff's expression of his ideas—then his copying will not subject him to liability." *Stillman,* 720 F.Supp. at 1357. Protection thus cannot extend to the "idea" or the "concept" which lies behind Plaintiff's jewelry, but only to the expressions of those ideas contained in the disputed pieces themselves. *See Peter Pan Fabrics, Inc. v. Martin Weiner Corp.,* 274 F.2d 487 (2d Cir.1960) ("no principal can be stated as to when an imitator has gone beyond copying the 'idea' and has borrowed its 'expression' [ ... but ... ] one should consider the uses for which the design is intended, especially the scrutiny that observers will give to it as used." *Id.* at 489.) Judge Leval explained the distinction between idea and expression as applied to copyrights on jewelry: "a detailed copying which takes not only the stylistic idea but the manner or details of execution will be found to infringe." *Jewelry 10, Inc. v. Elegance Trading Co.,* 1991 WL 144151 at *4 (S.D.N.Y. July 20, 1991).[10]

For each individual piece at issue in this litigation, the Court must determine whether [1] Plaintiff established—and Defendant failed to rebut—actual copying of its work; [2] Plaintiff held a valid copyright for the pieces in question; and [3] substantial similarities existed between protected elements of Plaintiff's works and Defendant's productions, warranting the conclusion that "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Warner Bros. Inc. v. American Broadcasting Companies, Inc.,* 654 F.2d 204, 208 (2d Cir.1981) ("*Warner Bros. I*") (quoting *Ideal Toy Corp. v. Fab-Lu Ltd.,* 360 F.2d 1021, 1022 [2d Cir.1966] );

---

10. In *Jewelry 10,* the plaintiffs satisfied their burden of proving access by showing that the defendants purchased one of almost every piece they later allegedly copied. *See Jewelry 10, Inc.,* 1991 WL 144151 at *1.

see also *Walker v. Time Life Films, Inc.*, 784 F.2d 44 (2d Cir.1986) ("substantial similarity should be judged by the spontaneous response of the ordinary lay observer." *Id.* at 51.)

## II. *Comparison of the Jewelry*

■ Comparison of individual pieces of Plaintiff's and Defendant's jewelry follows. Each individual piece introduced by Plaintiff is compared to Defendant's corresponding piece to determine whether there is substantial similarity as a matter of law. If two pieces are substantially similar, the analysis proceeds to consider whether Defendant had access to Plaintiff's piece prior to the creation of its piece. *Cf. Marisa Christina, Inc. v. Bernard Chaus, Inc.*, 808 F.Supp. 356, 358 (S.D.N.Y.1992). If striking similarity is found, the analysis will only proceed to proof of first publication.

■ Two facts about the market for 18 karat ancient inspired jewelry are relevant to the level of scrutiny a court must employ in comparing pieces to determine whether they are substantially similar. First, the cost of the jewelry which is the subject matter of this litigation, $1,000 to $10,000 a piece, suggests that the average observer would carefully examine each piece prior to making a purchase. Second, the jewelry produced by both parties is comprised largely of functional elements used by many designers working in the ancient inspired genre. Commonly used elements of jewelry designs are not entitled to copyright protection. *See DBC of New York, Inc. v. Merit Diamond Corp.*, 768 F.Supp. 414, 416 (S.D.N.Y.1991) (Individual elements of jewelry designs which were each separately well-known in the trade prior to the design and production of a particular piece are not entitled to protection.)

■ The nature of Plaintiff's business and the evidence introduced at trial further complicate its claims to copyright protection for the specific pieces of jewelry. Prior to trial, Plaintiff's business was apparently primarily retail; Plaintiff designed specific pieces of jewelry at the request of customers.

As a result, Plaintiff developed an ever-expanding "line" of jewelry comprised of many pieces that are similar in appearance but characterized by slight alterations. Several other companies, including Defendant Preville, produce similar jewelry. Plaintiff claimed a line of 200 pieces, but had to get samples returned from customers. When asked to demonstrate that such items had in fact been returned from customers, Plaintiff's principal Ms. Ripka provided no receipts or insurance records. Her line at Neiman-Marcus was never produced. Plaintiff's trial exhibits evidence these slight "variations on a theme"; Plaintiff's introduction of many pieces of jewelry and photographs, sketches and advertisements picturing slightly different pieces that have the same "look" suggests that Plaintiff seeks protection for a style of jewelry design. The copyright laws do not protect styles, but only particular original designs. *See Peter Pan Fabrics*, 274 F.2d at 489.

### A. *Exhibit 1/Exhibit A*

Plaintiff's Exhibit 1 (also known as "PN–1") is an 18 karat gold bracelet which incorporates mystery clasps and can be converted into a necklace by using a string of pearls. Plaintiff never applied for a Certificate of Copyright Registration for this piece, and did not at trial claim copyright infringement by Defendant.

### B. *Exhibit 2/Exhibit B*

Like Exhibit 1, Plaintiff's Exhibit 2 and Defendant's Exhibit B each form a bracelet which separates into three separate metal sections and can be joined with lengths of pearls to form a necklace. Each piece utilizes four "padlock" links similar in shape to the links of an Hermès Bracelet.[11] (Ex. 2C, U, JJ) The 18 karat gold padlock links are thick and flattened; they are encircled by diamonds at the center and by symmetrical bead patterns on either side of the diamonds. The toggles of each piece incorporate red cabochons at either end.

Defendant's Exhibit B is adorned by rope twists on the toggle and links, including the

---

11. One of Plaintiff's jewelry sketches revealed, after which Plaintiff admitted, that her employees refer to this jewelry as the "Hermès links."

(Tr. at 661–66.) Ms. Ripka, however, gave inconsistent testimony about her use of Hermès links. (Tr. at 658–668.)

ring and the pearl caps. Plaintiff's Exhibit 2 does not contain rope twists. The gold beads on Exhibit 2 are round. Exhibit B uses square beads. The toggle on Exhibit B is tapered and has widely spaced lengthwise ridges; it contains square beadwork and two sets of rope twists on both sides of the central ring of diamonds. The untapered toggle on Exhibit 2 has narrowly spaced ridges; it contains no rope twists and no beading.

The use of tapered toggle, square beads, and rope twists on Exhibit B make it appear more ornate than Exhibit 2. Moreover, both pieces use padlock shaped links inspired by the earlier design of Hermès. Examination of the non-functional elements of the two pieces yields the conclusion that, although they contain similar design elements, they are not substantially similar. Accordingly, Plaintiff cannot succeed on its claim that Defendant infringed its copyright on Exhibit 2.[12]

### C. Exhibit 3/Exhibit C

Plaintiff's Exhibit 3 and Preville's Exhibit C are both 18 karat gold earrings with a central mabe pearl, three ribs at the top, and a red cabochon at the bottom with a single rib on either side.

The central mabe pearl in Exhibit 3 is encircled with round gold beads. On Exhibit C, the cabochon is surrounded by gold fluting which tapers toward the pearl. The three ribs at the top of Plaintiff's Exhibit 3 are uniform in height. The central rib at the top of Defendant's Exhibit C is slightly higher than the two adjacent ribs. All three ribs on Exhibit C are in deeper relief than those of Exhibit 3. The ribs adjacent to the cabochon on Exhibit C are in deeper relief than those adjacent to the cabochon on Exhibit 3.[13] On Exhibit C, the cabochon is set on a raised platform; the cabochon on Exhibit 3 is set at approximately the same level as the gold beads. Defendant's expert, Lorraine DePasque, testified to a design difference between the two pairs of earrings:

> [t]hese two earrings, they actually have different elements. This [Exhibit C] has a very clear art deco look ... It has a very clear art deco look at the top with the kind of graduated fluting. And it's got even art deco fluting on the side which is recessed ... This [Exhibit 3] does not have a clear art deco feeling at the top like the other.

(Tr. at 1803.) Examination of the two pieces, in light of evidence of stylistic differences offered by Defendant, leads to the conclusion that they are not substantially similar. Accordingly, Plaintiff's claim that Defendant infringed its copyright on Exhibit 3 does not succeed.[14]

---

12. Even if Plaintiff's Exhibit 2 and Defendant's Exhibit B were substantially similar, Plaintiff did not introduce sufficient evidence to support an inference of access by Defendant. Plaintiff filed a certificate of copyright registration for Exhibit 2 on March 28, 1995. (Ex. 2A) The registration lists the title of the work as "PN2/3". The registration certificate states that creation of the piece was completed in 1991 and that it was first published on April 16, 1992. (Ex. 2A) A sketch introduced by Plaintiff to corroborate the date of creation was of a different but similar piece of jewelry than the one upon which Plaintiff's claim of infringement is based. (Ex. 2J) In addition, the only documentary evidence introduced to corroborate publication of Exhibit 2 is an order slip which calls for the production (but does not document an actual purchase) of style number PN3, not PN2/3. (Ex. 2C) Ms. Ripka's testimony about the discrepancy in style numbers was not convincing. (Tr. at 133.) In sum, Plaintiff did not provide evidence to corroborate the dates of creation and first publication listed on the certificate of registration for Exhibit 2. Accordingly, there was no proof of access by Defendant prior to the creation of Exhibit B.

13. Examination of Plaintiff's earrings displayed in Exhibit F to Plaintiff's supporting Affidavit to the Order to Show Cause, Exhibit 3, and Exhibit C highlights the manner in which the design of Exhibit C differs from the design of Plaintiff's mabe pearl earrings.

14. Even if the two pieces were, however, substantially similar, Plaintiff failed to carry its burden to prove that Defendant had access to Exhibit 3 prior to the creation of Exhibit C.

At trial, Plaintiff produced a certificate of registration for a copyright on Exhibit 3 which was filed on December 9, 1994. (Ex. 3A) The registration certificate lists 1990 as the year of creation of the piece and February 19, 1991 as the date of first publication. At trial, Plaintiff's designer, Wini Johnson, testified that she sketched the earring design on April 24, 1990. (Tr. at 919; Ex. 88). Ms. Johnson's testimony confirms PLaintiff's contention that Exhibit 3 was designed in 1990, but does not prove that the piece was published—to support an inference of access—at that time. Plaintiff offered no evidence to support a specific date of first publication.

#### D. *Exhibit 4/Exhibit D*

Both Plaintiff's Exhibit 4 and Defendant's Exhibit D are 18 karat gold heart-shaped pendants designed to clip-on a necklace. The two pieces both consist of a raised solid heart designed for the engraving of initials, and surrounded by round gold beads within a frame forming a larger, outside heart. Both pieces have two sets of double fluting on either side of the bottom of the heart.

The bail [15] on Exhibit 4 is straight and consists of two ribs with red cabochons on either side. The bail on Exhibit D flairs outward at the top; it has no cabochons and is set with a row of diamonds down the middle. The bail on Exhibit D is flanked by two tapered flutes that form a "V" to the sides of the bail. The bail on Exhibit 4 is flanked on either side by two rows of two diamonds; five diamonds are embedded at the bottom of the frame between the double ribs. The gold beads in the frame of Exhibit 4 are large and fill the space between the outside of the frame and the inner heart. The gold beads in the frame of Exhibit D are small and leave considerable space between the two hearts.

Although Exhibit 4 and Exhibit D are both gold heart pendants, they are not substantially similar. Accordingly, Plaintiff cannot prevail on its claim that Defendant infringed its copyright on Exhibit 4.

#### E. *Exhibit 5/Exhibit E*

Plaintiff's Exhibit 5 and Defendant's Exhibit E are both 18 karat gold earrings with detachable drops. Both pieces incorporate a row of small diamonds circling the center of the barrels, and both pieces are embellished with gold beadwork around the barrels and the detachable drops.

The earrings labelled Exhibit 5 are barrel-shaped with tapered ends. The earrings labelled Exhibit E have more of a squared off appearance, with untapered ends. The barrels and drops on Exhibit 5 have very small round beads in straight ridges, while the barrels and drops on Exhibit E have larger square beads and are edged by rope twists. The detachable drops in Exhibit 5 are round pearls in round beaded caps. The detachable drops in Exhibit E are square and set with amber cabochons; the beading on these caps is square; the caps also have a double row of rope twists. Exhibit 5 is larger than Exhibit E, giving it a bulkier effect. Exhibit 5 has a matte gold finish, whereas the finish on Exhibit E is polished gold.

Exhibit 5 and Exhibit E are not substantially similar. Accordingly, Plaintiff cannot succeed on its claim that Defendant infringed its copyright on Exhibit 5.[16]

#### F. *Exhibit 6/Exhibit F*

Plaintiff's Exhibit 6 and Defendant's Exhibit F are both large, octagonal, citrines set in 18 karat gold octagonal clip-ons. Each pendant uses a bail with a central line of diamonds flanked by ribs. Both pendants are embellished with round gold beadwork between the stone setting and the outer frame.

The two pieces are of different height and width—Exhibit 6 is wider, Exhibit F is longer. Exhibit F has fewer beads; they are

---

Accordingly, the Court cannot infer that Defendant had access to Exhibit 3 prior to the time Exhibit C was created and ordered, which occurred no later than July, 1993. (Ex. C8)

In addition to the lack of proof regarding Plaintiff's publication of Exhibit 3, Defendant introduced advertisements at trial which suggest that earrings using a design similar to that used in Exhibit 3 and Exhibit C were common in 1994. (Ex. BBBB1)

**15.** This is the piece that extends from the heart to a necklace.

**16.** Even if Exhibit 5 and Exhibit E were substantially similar, Plaintiff failed to carry its burden to prove that Defendant had access to Exhibit 5 prior to the creation of Exhibit E.

The copyright registration certificate for Exhibit 5 lists 1990 as the date of creation and October 20, 1991 as the date of first publication. Wini Johnson testified that she sketched the design for Exhibit 5 in 1990. (Tr. at 919; Ex. 5D) Plaintiff did not introduce sales slips or other documentary evidence of the publication of Exhibit 5 prior to the creation of Exhibit E.

Defendant offered documentary evidence that Exhibit E was first created and produced no later than May 1993 (Ex. E4, E8), and was first sold on June 27, 1994. (Ex. E9) Preville introduced an advertisement that appeared in mid-1994, portraying a set of earrings designed by Raafty which were similar in appearance to both Exhibit 5 and Exhibit E. (Ex. BBBB7)

recessed around the perimeter of the frame. The beads on Exhibit 6 are tightly spaced and raised. The bail on Exhibit 6 is shorter than the bail on Exhibit F, and Exhibit 6 has double flanking ribs which reach higher on the bail than the single flanking ribs on Exhibit F. The bail and adjacent ribs on Exhibit 6 are attached to the outside of the frame, while the bail and adjacent ribs on Exhibit F extend into the frame and reach the stone's setting.

Despite small differences, Exhibit 6 and Exhibit F are substantially similar.[17] Plaintiff must show that it held a valid copyright for Exhibit 6 and that Defendant had access to the piece prior to the creation of Exhibit F before the Court can infer that Preville copied its work.

Plaintiff filed a copyright registration certificate for Exhibit 6 on April 3, 1995. The certificate for Exhibit 6 lists 1990 as the date of creation and October 23, 1990, as the date of first publication. The evidence at trial showed that an octagonal clip-on was priced on October 23, 1990. (Ex. 6B) Additional evidence suggests that a similar piece was ordered on March 3, 1992. (Ex. 6C) Ms. Ripka, however, testified that Plaintiff makes several octagonal clip-ons (Compl.Ex. K); there was no evidence that the piece sketched and described in Exhibit 6B was for the piece that was ordered. (Tr. at 257.) The photographs attached to Plaintiff's Complaint produce further confusion about the octagonal clip-on piece for which Plaintiff claims copyright protection. Plaintiff attached as Exhibit K to its Complaint photographs of *two* octagonal clip-ons; neither of the photographs represented the piece later produced by the Plaintiff, which appears to be the piece photographed for the copyright office after inspection of Defendant's jewelry. No credible evidence of the particular piece introduced at trial being made or sold was offered. Plaintiff has failed to satisfy its burden of demonstrating that it held a valid copyright for Exhibit 6 prior to the time

Defendant first produced Exhibit F. Accordingly, Plaintiff does not succeed in its claim that Preville violated its copyright in Exhibit 6.

G. *Exhibit 7/Exhibit G*

Both Exhibit 7 and Exhibit G are necklaces composed of 18 karat gold padlock-shaped "Hermès" links which incorporate beads and ribbing in a symmetrical pattern around their centers. Both pieces use bezel-set diamonds in some links. The links containing diamonds have ribs on either side of the stones and beading above and below them. The padlock-shaped links are attached by connector links which also are adorned by gold beadwork.

Exhibit 7 is to be worn only as a necklace. Exhibit G consists of two bracelets (one with diamonds and one without) and an extension which may be hooked together to form a necklace or choker. The links in Exhibit 7 are curved and form a less flexible necklace than the straight links in Exhibit G. The links in Exhibit G are composed of arms of a single thickness which extend through the connectors, while the links on Exhibit 7 use a small cross bar attached to two larger arms which attach to the connectors. The connectors on Exhibit 7 are short with tightly spaced beads. The connectors on Exhibit G are long with widely spaced beads. The links on Exhibit G incorporate either a large central bead or a diamond. The links on Exhibit 7 use beads of a uniform size. Exhibit 7 incorporates a total of 11 diamonds in the links, and Exhibit G uses a total of 7 diamonds in the links.

Defendant introduced evidence suggesting that links like those used in both Exhibit 7 and Exhibit G are commonly used in bracelets and necklaces designed in the ancient inspired genre. (Ex. BBBB12, BBBB15, BBBB16, BBBB17) Although the style of these two pieces is similar, differences in the links and connectors that comprise Exhibit 7 and Exhibit G preclude the conclusion that they are substantially similar.[18] Accordingly,

---

17. In its original Complaint, Plaintiff claimed that Defendant had infringed its copyright on an octagonal clip-on, but provided as Exhibit K to the Complaint and the Affidavit in Support of Plaintiff's Order to Show Cause a color photo-

copy of octagonal clip-ons with large blue stones and more elaborate beadwork than either Exhibit 6 or Exhibit E.

18. Even if the two pieces were substantially similar, Plaintiff failed to meet its burden to prove

Plaintiff's claim that Defendant infringed its copyright for Exhibit 7 must fail.

### H. *Exhibits 8 and 8B/Exhibits H1 and H2*

Exhibits 8, 8B, H1 and H2 are all 18 karat gold clip-ons with heart-shaped center stones in heart-shaped gold frames. Both sets of pieces incorporate gold beadwork between the stones and frames. All of the pieces have straight bails which connect the pendants to a necklace.

Plaintiff's Exhibit 8 has a heart-shaped mabe pearl in the center. Plaintiff's Exhibit 8B has a heart-shaped pink tourmaline cabochon in the center. On both pieces, the stone is surrounded by large beadwork. Each piece has a row of five diamonds at the bottom of the heart-shaped frame and ribs and small rows of diamonds at the top. The gold frame which surrounds both pieces is thin and recessed; it is heart shaped at the top. The bail of Exhibit 8 has two ribs and bezel-set ruby cabochons on either side. The bail of Exhibit 8B is set with diamonds.

Defendant's Exhibit H1 has a heart-shaped mabe pearl stone in the center. Defendant's Exhibit H2 has a heart-shaped pink tourmaline in the center. On both pieces, the stone is completely surrounded by beads much smaller and more numerous than Plaintiff's. The gold frame which surrounds each piece has a thick outer border; it is rounded at the top. The bail of each piece is lined with diamonds and a single ridge on either side.

Plaintiff's Exhibits 8 and 8B and Defendant's Exhibits H1 and H2 are not substantially similar.[19] Accordingly, Plaintiff does not succeed on its claim that Defendant infringed its copyright on this piece.

### I. *Exhibit 10/Exhibit I*

Exhibit 10 is a pair of 18 karat gold matte finish round earrings with a mabe pearl center, a gold frame with large round beads at the sides, two diamonds flanked by two ribs at the top and a bezel-set oval ruby cabochon flanked by two ribs on either side at the bottom. The mabe pearl setting is encircled by a plain ridge. Exhibit I is a pair of 18 karat gold matte polished earrings with a round mabe pearl center, a rope twist around the pearl and a gold border which consists of soft flutes which flare outward from the stone setting. Exhibit 10 is adorned at the top with two diamonds set off adjacent gold beads by double-fluting. The top of Exhibit I incorporates seven diamonds in two rows; the cabochons at the base of Exhibit I are encircled by three gold beads.

The rope twist, polish and fluting combine to give Exhibit I a more ornate appearance than Exhibit 10. Plaintiff's Exhibit 10 and Defendant's Exhibit I are not substantially similar. Accordingly, Plaintiff's claim that

---

that Defendant had access to Exhibit 7 prior to the creation of Exhibit G. Plaintiff filed a certificate of copyright registration for Exhibit 7 on April 13, 1995. The date of creation listed on the copyright registration is 1993, and the date of first publication is listed as December 2, 1993. (Ex. 7A) The first model of links for Exhibit G was made in January 1993, according to a sales slip from Sumer Gold. (Ex. G3) An invoice produced at trial showed that this piece was first sold on July 15, 1993. (Ex. G7)

Defendant produced evidence which indicates that Exhibit G was in fact first produced and sold by mid–1993, at least 4½ months earlier than Plaintiff claims Exhibit 7 was first published on its copyright registration certificate.

**19.** Even if Exhibits 8 and 8B were substantially similar to Exhibits H1 and H2, Plaintiff failed to meet its burden to prove that Defendant had access to Exhibits 8 and 8B prior to the creation of Exhibits H1 and H2. Plaintiff produced copyright registration certificates for Exhibit 8 which were filed on April 3, 1995. The certificates list 1990 as the date of creation and January 23, 1991 as the date of first publication. (Ex. 8A) Ms. Ripka testified that these dates were correct. (Tr. at 223–58.) Ms. Kolen testified that Exhibits 8 and 8B were "staple[s] with the line from when I started" (Tr. at 933) and thus had been created prior to late 1990. Ms. Shari Horowitz testified that she purchased Exhibit 8F, which is identical to Exhibit 8, except that it has emerald cabochons instead of rubies, in early 1991. (Tr. at 562). Plaintiff has provided adequate evidence to support a finding that Exhibit 8 was created and sold as early as January, 1991. Sale of the jewelry to a single customer in early 1991—or even to several customers thereafter—does not, however, support a finding that the jewelry was published sufficient for a finding that it was accessible to Defendant on or before the date of its publication of the corresponding piece. *Cf. Selle v. Gibb*, 741 F.2d 896 (7th Cir.1984). Exhibits H1 and H2 were first made in July 1993. (Ex. H9) Exhibit H1 was first sold on October 28, 1993 (Ex. H10), and H2 was first sold on October 29, 1993. (Ex. H11)

Defendant infringed its copyright on Exhibit 10 does not succeed.

### J. *Exhibit 12/Exhibit J and K*

Plaintiff's Exhibit 12 is an 18 karat gold matte pear-shaped clip-on with a pear-shaped diamond center surrounded by diamonds and held by a straight gold frame bail. It is clipped onto a gold center section of a bracelet that may be screwed into pearls. Defendant's Exhibit K is an 18 karat gold pear-shaped clip-on with a pear-shaped diamond center surrounded by rope twist and held by a pie-shaped bail. The bail is set with pave diamonds in a triangular shape and a gold rib which flares outward towards the top. Defendant's Exhibit J is a section of the same design link bracelet as Defendant's Exhibit A.

The pendant frame of Exhibit 12 is larger in relation to the stone than the frame of Exhibit K. Exhibit 12 incorporates two rows of diamonds on either side of the central stone; there are no diamonds on the frame of Exhibit K. Within the flaired bail, the pendant of Exhibit K incorporates seven small diamonds between double ridges. In contrast, the straight bail of Exhibit 12 is unadorned. There are three rows of gold beads within the ridges of the pendant frame on Exhibit 12, whereas the frame of the pendant on Exhibit K is adorned only by a rope twist which encircles the large central stone.

The chain link portions of Exhibit 12 and Exhibit J both contain the same configuration of metal links. The two barrel links on Exhibit 12 are each encircled by three rows of small diamonds; they are connected to unadorned links by a double-ridged loop on either side. The two barrel links on Exhibit J are encircled by three bezel-set diamonds alternating with three gold beads. The pearl caps on Exhibit 12 are encircled by three ridges, and the pearl caps on Exhibit J are encircled by a row of gold beads between double ridges.

Exhibit 12 and Exhibits J and K are not substantially similar. Accordingly, Plaintiff does not prevail on its claim of copyright infringement for Exhibit 12.[20]

### K. *Exhibit 13/Exhibit L*

Exhibit 13 and Exhibit L are both bracelets composed of multiple pearl strands interrupted by gold connectors which extend the width of the bracelet; they are known as "stations."[21] Exhibit 13 consists of three pearl strands and three identical stations. Each station consists of a central row of

---

20. At trial, Plaintiff introduced as Exhibit 12H a bracelet comprised of gold links and pearl caps similar to those used on Plaintiff's Exhibit 1, and rondels encircled by three rows of small diamonds. Plaintiff made no motion to amend its Complaint to include a claim of copyright infringement with respect to this item. Even ignoring this deficiency with respect to Plaintiff's claim regarding this item, a claim for copyright protection for Plaintiff's Exhibit 12H would not succeed.

During the testimony of Leslie Trompeter, a former employee of Plaintiff who had operated a jewelry boutique in Woodmere, New York, distributing the Preville line, Plaintiff introduced as Exhibit 12G a chain link bracelet, incorporating pearl caps and a toggle bar and ring identical to that used in Defendant's Exhibit A and rondels encircled by a single row of small diamonds designed by Preville. Plaintiff later introduced as Exhibit 12H a bracelet similar in appearance, which Ms. Ripka said she had designed for her sister-in-law, but which has no source identification. For this item, Plaintiff produced a photocopy of an application for copyright registration for this item; the original was mailed on May 10, 1995. The copy of the application introduced at trial has no stamp from the Copyright Office and

no evidence has been presented that a registration issued; thus, Plaintiff did not satisfy its burden of showing that it held a valid copyright for Exhibit 12H.

The unstamped certificate presented by Plaintiff at trial claimed that the work was completed in 1990 and first published on May 4, 1990. To corroborate the date of first publication, Plaintiff introduced a photocopy of a sales memorandum, with the customer's name redacted, dated May 4, 1990 (Ex. 12E), and a check from Ms. Ripka's brother-in-law, Robert Berk, for $5,300. (Ex. 12D) Accordingly, even if Plaintiff had amended its Complaint to include a claim of infringement with respect to this item and even if Plaintiff did demonstrate that it held a valid copyright on Exhibit 12H, it failed to demonstrate publication of Exhibit 12H prior to creation of Defendant's Exhibit 12G and its claim of infringement on that piece would not succeed.

21. In its original Complaint and the Affidavit of Judith Ripka attached to Plaintiff's Order to Show Cause ("Ripka Aff."), Plaintiff provided a color photocopy of a pearl bracelet that was different from the one introduced at trial as Exhibit 13. (Compl.Ex. Y, Ripka Aff.Ex. Y)

diamonds adjacent on either side to rows of round gold beads on either side and flanked by a ridge along the two edges. Exhibit L is composed of four pearl strands and three stations; the center station is adorned by a row of diamonds. There are square gold beads with rope twists running along the edges. This station separates between the diamonds and one row of beads to form the clasp of the bracelet. The other two stations on Exhibit L are adorned by a single row of square gold beads with rope twists along the edges.

At trial, Defendant introduced evidence demonstrating that multiple pearl strand bracelets resembling both Plaintiff's Exhibit 13 and Preville's Exhibit L are common. (Ex. BBBB2). No contrary evidence was offered. Given differences between the bracelets and the popularity of similar multiple pearl strand bracelets, Plaintiff's Exhibit 13 and Defendant's Exhibit L are not substantially similar. Accordingly, Plaintiff does not succeed on its claim of copyright infringement for Exhibit 12.

### L. *Exhibit 14/Exhibit M*

Plaintiff's Exhibit 14 and Defendant's Exhibit M are both toggle bar and ring closures which can be attached by pearl caps with mystery clasps to a strand of pearls. Plaintiff sells the piece connected to a strand of pearls. Defendant does not sell pearls as part of its line. The toggle bar and ring on Exhibit 14 are identical to the toggle bar and ring used in Exhibit 2. The toggle bar and ring on Exhibit M are identical to the toggle bar and ring used in Exhibit B. The pearl caps on Exhibit 14 have round gold beads recessed within ridges. The pearl caps on Exhibit M incorporate raised square gold beads and a single rope twist. Exhibit 14 also incorporates single unadorned links between the pearl caps and both the toggle bar and ring. Exhibit M uses several small connectors and no large links to attach the toggle bar and ring to the pearl caps.

Rope twists, more elaborate bead work, and the use of polished gold give Defendant's

Exhibit M a more ornate appearance than Plaintiff's Exhibit 14. Plaintiff's Exhibit 14 and Defendant's Exhibit M are not substantially similar. Accordingly, Plaintiff's claim of copyright infringement for Exhibit 14 must fail.

### M. *Exhibit 15/Exhibit N*

Plaintiff's Exhibit 15 and Defendant's Exhibit N are both 18 karat gold earrings with octagonal frames enclosing octagonal stones. Both pieces incorporate round gold beads between the stone and the edge of the frame, and a row of diamonds that extends from the bottom center of the stone on gold bars.

The bottom of the gold frame on Exhibit 15 is comprised of a center row of diamonds flanked by a gold rib and two flutes on either side. The four corners of the frame are comprised of a heavy rope twist flanked on either side by a flute. The frame of Exhibit 15 is decorated by four large round beads on either side and three large round beads across the top. Exhibit N is decorated with 22 small round gold beads which surround the central stone; they are interrupted only by a gold bar embellished with diamonds at the bottom. Exhibit N does not use any rope twists; the only ridges along the frame are single ridges adjacent to either side of the row of diamonds at the bottom.

Exhibit 15 and Exhibit N are not substantially similar. Accordingly, Plaintiff's claim of copyright infringement on this piece does not succeed.

### N. *Exhibit 17/Exhibit O*

Both Exhibit 17 and Exhibit O are 18 karat gold necklaces composed of Hermès type padlock-shaped links attached by smaller connecting links.[22] Both necklaces contain seven padlock links which have a single row of diamonds with a row of gold beads running along either side; the other padlock links replace the diamonds with a wide flat ridge.

Exhibit 17 is reversible and uses a lobster claw clasp as a closure. Exhibit O may be

---

**22.** Exhibit LL, introduced by Defendant, is a silver bracelet composed of oval links very similar in shape to those used in Plaintiff's Exhibit 17 and somewhat similar to those used in Defen-

dant's Exhibit O. The padlock links are connected by plain oval connecting links. The bracelet is stamped with the Hermès mark.

separated into one bracelet, two bracelets, or a choker. Its closures are comprised of three hidden slide clasps. Exhibit 17 utilizes round beading, while Exhibit O uses square beading. Exhibit O has rope twists along the edges of the padlock and connector links, whereas the padlocks and connecting links on Exhibit 17 are plain.

At trial, Plaintiff's principal Judith Ripka testified to similarities between Plaintiff's Exhibit 19 and Defendant's Exhibit G,[23] she said:

> The Witness: [T]his [Exhibit 17] was my link originally . . .
>
> The Court: And you say those links are the same as Exhibit G
>
> The Witness: Not the same but similar in thought
>
> The Court: What do you mean "similar in thought"
>
> The Witness: The ovalness.

(Tr. at 343–44.) Plaintiff cannot protect its use of oval Hermès type padlock links in its jewelry. The shape of the links used in Plaintiff's 17, moreover, is more similar to the links used in the Hermès bracelet (Ex. LL) than it is to the links used in Defendant's Exhibit O. The flatness of the links used in Exhibit O gives that piece a less bulky look than Exhibit 17.

Though the style of the two necklaces is similar, differences in the design of the padlocks used in each and in the connecting links precludes the conclusion that they are substantially similar. Accordingly, Plaintiff does not succeed on its claim that Defendant infringed its copyright on Exhibit 17.

**O. *Exhibit 18/Exhibit P***

Plaintiff's Exhibit 18 and Defendant's Exhibit P are both woven leather necklaces with toggle bar and ring closures attached to the leather by pearl caps. The toggle bar and ring on Exhibit 18 are identical to those on Exhibit 2, and the toggle bar and ring on Exhibit P are identical to those on Exhibit B, except that the toggle bar on Exhibit P does not have a central ring of diamonds. The pearl caps on Exhibit 18 are encircled by gold beads flanked on either side by ridges;

the toggle bar is attached by three small, unadorned connecting links to a pearl cap, and the loop is directly attached to the other pearl cap. The pearl caps on Exhibit P are encircled at the top by square gold beads, with a rope twist below and tapering at the bottom. The toggle bar on Exhibit P is attached by two small connectors to a pearl cap, and the loop is directly attached to the other pearl cap.

Due to Defendant's use of a tapered toggle and elaborate ring and square beaded, tapered pearl caps, the overall appearance of Exhibit P is more ornate than Exhibit 18.

At trial, Defendant introduced evidence that other designers have created braided leather necklaces with toggle bar and ring closures which resemble those of Plaintiff and Defendant. (Ex. BBBB18). Given the common use of these elements and the design differences between the pearl caps, toggle bars and rings used by Plaintiff, Exhibit 18 and Exhibit P are not substantially similar. Therefore, Plaintiff does not prevail on its claim that Defendant infringed its copyright on Exhibit 18.

**P. *Exhibit 19/Exhibit Q***

Both Exhibit 19 and Exhibit Q are bracelets comprised of five strands of potato pearls with a toggle bar and ring closure. The toggle bar and ring closure in Exhibit 19 is identical to that of Exhibit 18 with different pearl caps. The toggle bar and ring closure in Exhibit Q closely resembles that of Exhibit P. Plaintiff may not claim infringement based on Defendant's use of the five-stranded potato pearls and a toggle bar and ring closure, which is a functional element. Plaintiff cannot prevail on its claim that Defendant infringed its copyright on Exhibit 19.

**Q. *Exhibit 20/Exhibit R***

Plaintiff's Exhibit 20 is a pearl necklace connected to a section with toggle bar and ring closure which has three ridged pearl caps identical to those used in Exhibits 1 and 12. The pearl caps on either side of the section are connected by plain gold links to two beaded pearl caps which are screwed

---

**23.** The similarity of the links used in Defendant's G to those used in Exhibit O renders Ms. Ripka's comparison relevant to the links used in Exhibit O.

together to form a barrel-shaped piece into two rows of beads. The toggle bar has two rows of diamonds flanked by a rib on either side, and a rib around the bezel for the cabochon on either end.

Defendant's Exhibit R is also a gold link section displayed as an attachment to a pearl necklace. Its two ridged pearl cap is identical to the one used in Exhibit A. Two large gold links connect the pearl caps to rondels which have a single row of square beads flanked by gold bars and rope twists. The toggle bar has two rows of diamonds flanked by a rib on either side, and double ribbing around the bezel for the cabochon on either end. The appearance of Exhibit 20 is similar to that of Exhibit R, but there are enough differences in the appearance of original elements incorporated in the two pieces to preclude a conclusion that they are substantially similar. Accordingly, Plaintiff does not succeed on its claim that Defendant infringed its copyright on Exhibit 20.[24]

### R. *Exhibit 21/Exhibit S*

Plaintiff's Exhibit 21 is essentially the same piece as Plaintiff's Exhibit 2. The only difference, except for the fact that Exhibit 2 was presented at trial in the form of a bracelet and not attached to pearls, is that the Hermès links on Exhibit 2 have a center row of diamonds, whereas the links on Exhibit 21 are plain gold. Defendant's Exhibit S is similarly identical to Defendant's Exhibit B, with the exception of a row of diamonds which adorns each link on Exhibit S but not on Exhibit B. Since Plaintiff's Exhibit 2 and Defendant's Exhibit B are not substantially similar, neither are Plaintiff's Exhibit 21 and Defendant's Exhibit S. Accordingly, Plaintiff's claim that Defendant infringed its copyright for Exhibit 21 does not succeed.

### S. *Exhibit 22/Exhibit T*

Plaintiff's Exhibit 22 and Defendant's Exhibit T are both single strands of small "baby" or potato pearls with two gold rondels with a toggle bar and ring closure. On each necklace, a gold rondel encircled by small round, gold beads is placed six pearls up from the toggle bar and ring. The toggle bar on Exhibit 22 is fluted, with a row of beads around the center flanked by two gold ribs. Each end of the bar on Exhibit 22 is capped by bezel-set ruby cabochons. The ring on Plaintiff's Exhibit 22 is beaded. The toggle bar on Defendant's Exhibit T is not fluted or beaded and has no cabochons on the ends. It has three ribs in the center and a rib on either end of a plain gold bar. The ring is plain.

Use of a toggle bar and ring closure for a strand of small pearls is functional and therefore not protectible. Furthermore, the toggle bar and rings are distinctly different. Lastly, trial testimony of Ms. Siskin revealed that the gold beaded rondels on the two pieces—which are slightly different—were similarly placed because the rondels were strung in the position which made them most visible when the necklace was worn. (Tr. at 1212–1213.) Placement of the rondels was, in this piece, functional and not entitled to copyright protection. Defendant's Exhibit T does not infringe Plaintiff's Exhibit 22.

### III. *Trade Dress Infringement*

█ Plaintiff also requests injunctive relief under § 43 of the Lanham Act 15 U.S.C. § 1125(a). A plaintiff who seeks money damages under the Lanham Act must introduce evidence of actual consumer confusion; a plaintiff seeking injunctive relief need only prove a likelihood of confusion. *See Resource Developers, Inc. v. Statue of Liberty–*

---

**24.** Even if Exhibit 20 and Exhibit R were substantially similar, Plaintiff could not succeed on its claim of copyright infringement for this piece because it failed to satisfy its burden to prove that Defendant had access to Exhibit 20 prior to the creation of Exhibit R. Exhibit 20 was copyrighted on April 3, 1995 and lists the date of first creation as 1990 with first publication on October 15, 1990. (Ex. 20A) The only documentary evidence offered at trial to confirm any sale of Exhibit 20 was an order form naming Diane Silverman as the customer. (Ex. 20B) Ms. Ripka

testified that the order form reflected a sale of Exhibit 20 to Ms. Silverman; the form was dated December 19, 1992. (Tr. at 300–02; Ex. 20B) Ms. Silverman did not testify by deposition or at trial. The December 19, 1992 date of sale testified to at trial does not support the copyright registration certificate's representation that publication of the piece first occurred in 1990. Defendant offered evidence that Exhibit R was created no later than July 1992, and was first sold on October 6, 1992. (Tr. at 1201; Ex. R5, R6)

*Ellis Island Foundation, Inc.,* 926 F.2d 134, 139 (2d Cir.1991).

Protection of the trade dress of a product can involve the "total image" of the product as designed. *See DBC of New York, Inc. v. Merit Diamond Corp.,* 768 F.Supp. 414, 417 (S.D.N.Y.1991). To receive protection for a trade dress under § 43 of the Lanham Act, a plaintiff must show: [1] that the trade dress is either inherently distinctive or has acquired distinctiveness through a secondary meaning; and [2] likelihood of confusion between the plaintiff's trade dress and the defendant's trade dress. *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992); *Merriam-Webster, Inc. v. Random House, Inc.,* 35 F.3d 65, 71 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1252, 131 L.Ed.2d 133 (1995). With respect to analysis of whether design of a particular item merits Lanham Act protection, the Second Circuit recently explained that a court must "ask whether [the trade dress] is 'likely to serve primarily as a designator of origin of the product' ". *Knitwaves Inc. v. Lollytogs Ltd.,* 71 F.3d 996, 1008 (2d Cir.)

Plaintiff has introduced no evidence to prove that its jewelry has acquired secondary meaning. Like the sweater designs contemplated by the Second Circuit in *Knitwaves,* the primary purpose of Ripka's designs is aesthetic, not source identifying. *Knitwaves,* 71 F.3d at 1006. For this reason, Plaintiff's jewelry designs "do not meet the first requirement of an action under § 43 of the Lanham Act—that they be used as a mark to identify or distinguish the source." *Id.*[25]

Plaintiff's jewelry, moreover, is not inherently distinctive. Defendant presented several examples of jewelry by designers other than Plaintiff and Defendant that use the same elements as Plaintiff's, namely: ancient inspired design elements such as beading, fluting, rope twists, toggle bar and ring closures, 18 karat gold matte finish green gold, gold bracelets that screw into pearls with mystery clasps, gold and leather combinations, padlock shaped links, art deco design, clip-on pendants, bezel-set or bead-set gemstones and diamonds. Plaintiff's expert testified that she would not be able to identify Plaintiff as the manufacturer of a piece of Ripka jewelry if she saw someone wearing the jewelry on the street. (Tr. at 912.) Defendant's expert, Lorraine DePasque, testified that the ancient inspired design elements used in Plaintiff's collection have been common among that genre of jewelry for a number of years. The trade dress of Plaintiff's jewelry is not likely to serve primarily as a designator of origin; accordingly, it does not merit injunctive relief under the Lanham Act. *Knitwaves,* 71 F.3d at 1008.

At trial, moreover, Plaintiff introduced no proof of actual consumer confusion or likelihood of confusion between Plaintiff's jewelry and Defendant's jewelry. Although evidence of actual confusion is not a prerequisite to a finding of likelihood of confusion, its absence weighs against such a finding.[26] *See Life Industries Corp. v. Star Brite Distributing, Inc.,* 31 F.3d 42, 47 (2d Cir.1994). In *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961), the Second Circuit set forth eight nonexclusive factors to be considered by courts assessing the likelihood of confusion: [1] the strength of the plaintiff's trade dress; [2] the degree of similarity between the plaintiff's trade dress and that of the alleged infringer; [3] the proximity of the products; [4] the likelihood that the plaintiff will bridge the gap; [5] actual confusion; [6] the alleged infringer's good faith in adopting its dress; [7] the quality of the alleged infringer's product; and [8] the sophistication of the buyers of the product. *Polaroid Corp.,* 287 F.2d at 495;

---

**25.** Many of the pieces for which Plaintiff claims protection under the Lanham Act, moreover, bear no source identifying mark at all. (Ex. 4, 8F, 12, 12H, 14, 17, 20, 22)

**26.** Plaintiff did seek to offer such testimony but had given Defendant no notice it would make such an offer. (Tr. at 5–29.) Accordingly, Plaintiff was precluded from offering survey evidence which was based upon data not disclosed to Defendant until four days into the trial. (Tr. at 712–727.)

*EFS Marketing, Inc. v. Russ Berrie & Co. Inc.,* 836 F.Supp. 128 (S.D.N.Y.1993).

Strength of a trademark is defined as "its tendency to identify the goods sold under the mark as emanating from a particular source." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 873 (2d Cir.1986) (citing *McGregor–Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1131 (2d Cir.1979)). At trial, Plaintiff did not prove that 18 karat gold matte jewelry with ancient inspired motifs is associated within the trade or by the public with the name "Judith Ripka" or any particular source of origin. Plaintiff's expert testified that "[e]verybody is doing this look now." (Tr. at 869.) Defendant, moreover, produced numerous examples of designers whose jewelry is 18 karat matte gold with ancient inspired designs that resemble those created by Plaintiff. (Tr. at 1725–1772.) These characteristics are not associated with or confined to Plaintiff's jewelry.

The jewelry designed and produced by Plaintiff uses some of the same design elements, such as beading, fluting, rope twists, green gold, semi-precious and precious stones, mystery clasps, and toggle bar and ring closures, as that of Defendant. All of these features are common in the trade and not identifiable with a particular source.

With respect to the third and fourth *Polaroid* factors, the proximity of the products and the likelihood that Defendant will bridge the gap, only twenty-two pieces designed by Defendant were chosen by Plaintiff as "knock offs" from Defendant's entire line, which presently contains over 250 items, a relatively small number, in view of the fact that the two lines are of the same genre of jewelry as are several other lines. Both Plaintiff and Defendant sell high end, 18 karat gold, ancient inspired jewelry. Testimony at trial was that Ripka jewelry is sold primarily at Plaintiff's retail outlet or outlets, at trunk shows, or on consignment at a limited number of Neiman–Marcus locations. Ninety percent of Defendant's business is wholesale. (Tr. at 971.) Preville's jewelry is purchased by retailers and sold throughout the United States and abroad. (Tr. at 968.) No evidence was introduced at trial showing that Plaintiff's and Defendant's jewelry which is the subject of this litigation is or has been sold by the same retailers anywhere in the United States. Although there was evidence from Leslie Trompeter that she had desired to sell the Ripka line and that she decided to sell the Preville line because the two lines had the same look, Plaintiff introduced no evidence of actual confusion between Plaintiff's jewelry and Preville's.[27] The testimony of Plaintiff's own expert revealed that, upon the type of close examination purchasers of high-end jewelry typically give to pieces prior to making a purchase, the jewelry of Defendant would not be mistaken for that of Plaintiff. (Tr. at 895.) The jewelry which is the subject of this litigation retails for approximately $1,000 to $10,000 a piece. Consumers are likely to exercise care in selecting the jewelry they will purchase. The significant expense of the items therefore lessens the likelihood of consumer confusion as to origin. *Cf. Life Industries Corp. v. Star Brite Distributing, Inc.,* 31 F.3d 42 (2d Cir. 1994) ("The cost of the product is a valid consideration in analyzing likelihood of confusion because consumers are likely to be less careful when purchasing cheap items." *Id.* at 47.) Upon examination, jewelry designed and manufactured by Preville differs in appearance from jewelry designed and manufactured by Plaintiff.

Defendant sells its jewelry at trade shows where its name is displayed prominently and to retail jewelry stores that are not confused as to the source of the items they purchase. Preville provides its retailers with velvet pouches stamped "Penny Preville" in which to place jewelry for resale to customers and a lucite plaque engraved "Penny Preville" to display with the Preville jewelry at the point of sale. Preville has provided this or a variation of such a showcase plaque to its retailers since the 1970's. (Tr. at 973–74.) To purchase Plaintiff's jewelry, a customer must go to a store called "Judith Ripka" or a Judith Ripka trunk show. Customers who purchase

---

27. During her testimony, Ms. Trompeter never indicated that she sold pieces of Preville's jewelry as "knock-offs" of Ripka's.

at a Judith Ripka store or show are not likely to confuse jewelry designed by Plaintiff with Defendant's designs.

Preville, moreover, inscribes its jewelry with the hallmark "PP," for which it has received federally-registered trademark approval, and the karatage "18k" in each piece of its jewelry. This is done pursuant to federal law requirements (*see* 15 U.S.C. § 297) and to foster an association between the jewelry and Preville as its source. (Tr. at 1046–48.) The presence of the mark of the designer on each piece of jewelry lessens the possibility of confusion as to origin. *See Bose Corp. v. Linear Design Labs, Inc.*, 467 F.2d 304, 309 (2d Cir.1972). No evidence was produced at trial demonstrating an intent on Preville's part to replicate Ripka jewelry.[28]

Analysis of the factors set forth by the *Polaroid* court to assess likelihood of confusion reveals that consumers are unlikely to confuse Plaintiff's jewelry with the jewelry of Defendant. Accordingly, Plaintiff's Lanham Act claim for injunctive relief fails.

IV. *Injury to Business Reputation and Dilution under N.Y.Gen.Bus.L. § 368–d*

██ Injunctive relief under Section 368–d of the New York General Business Law is available where "a defendant is attempting to 'feed[ ] upon the business reputation of an established distinctive trade-mark or name.' " *Kraft General Foods, Inc. v. Allied Old English, Inc.*, 831 F.Supp. 123, 133 (S.D.N.Y. 1993) (quoting *W.W.W. Pharmaceutical Co., Inc. v. Gillette Co.*, 984 F.2d 567, 576 (2d Cir.1993)). To establish injury to business reputation and dilution under New York's anti-dilution statute, N.Y.Gen.Bus.L. § 368–d, a plaintiff must establish three elements: (1) distinctiveness of the mark either from its distinctive quality or from secondary meaning; (2) likelihood of dilution by the blurring of product identification or the tarnishing of an affirmative association a mark has come to convey; and (3) predatory intent of the junior user. *Deere & Co. v. MTD Products, Inc.*, 41 F.3d 39, 42 (2d Cir.1994).

██ Plaintiff has not introduced evidence demonstrating that it has a strong mark or that its jewelry has acquired any secondary meaning. The pieces of Plaintiff's jewelry that are the subject of this litigation are part of the ancient inspired genre; they contain elements common to the jewelry of other designers in the industry who design in the same genre. Plaintiff did not introduce evidence that its jewelry is identifiable with a particular source.

With respect to likelihood of confusion as to source, the relevant consumer within the meaning of the statute is a potential purchaser of the junior user's goods or services. Plaintiff introduced no evidence of consumer confusion as to the source of Preville's or its own jewelry. Although Plaintiff identified five customers who had ceased to be customers of Plaintiff over the past three years, they were not called as witnesses and no evidence was introduced to demonstrate that they had ceased to be customers because of Preville. (Tr. at 938–39.) Furthermore, no evidence showed Defendant intended to promote its product by copying Plaintiff's jewelry. Accordingly, Plaintiff's claim for injunctive relief under N.Y.Gen.Bus.L. § 368–d must fail.

Plaintiff has established neither tarnishing of reputation nor dilution required to prevail on a claim under N.Y.Gen.Bus.L. § 368–d. *Jordache Enterprises, Inc. v. Levi Strauss & Co.*, 841 F.Supp. 506 (S.D.N.Y.1993).

V. *Deceptive Trade Practices*

██ Plaintiff claims that Defendant engaged in deceptive or false trade practices in violation of N.Y.Gen.Bus.L. § 133. The provision reads:

No person, firm, or corporation shall, with intent to deceive or mislead the public, assume, adopt or use as, or as part of, a corporate, assumed or trade name, for advertising purposes or for the purposes of trade, or for any other purpose, any name, designation or style, or any symbol or simulation thereof, or a part of any name, designation or style, or any symbol or sim-

---

**28.** Trompeter did testify that a salesperson at Preville stated that they were willing to replicate jewelry (whether heirloom or of a competitor was not resolved). (Tr. at 547–49.) A salesperson for Ripka, however, indicated that Ripka did in fact replicate a piece of jewelry of a well known designer. (Tr. at 1552–53.)

ulation thereof, which may deceive or mislead the public as to the identity of such person, firm or corporation or as to the connection of such person, firm or corporation with any other person, firm or corporation; nor shall any person, firm or corporation with like intent, adopt or use as, or as part of, a corporate, assumed or trade name, for advertising purposes, or for the purposes of trade, or for any other purpose, any address or designation of location in the community which may deceive or mislead the public as to the true address or location of such person, firm or corporation.

N.Y.Gen.Bus.L. § 133. Injunctive relief under § 133 of the General Business Law may be available if

> 'it shall appear to the satisfaction of the court of justice that the defendant is in fact assuming, adopting or using such name, or is about to assume, adopt or use such name, and that the assumption, adoption or use of such name may deceive or mislead the public.'

*Wilma Gowns, Inc. v. Wilma Juniors, Inc.*, 82 N.Y.S.2d 119 (Supreme Court, N.Y.Cty, 1948). As explained above, Plaintiff has not provided adequate proof that Defendant's jewelry designs may deceive or mislead the public as to their source. Accordingly, Plaintiff is not entitled to injunctive relief under N.Y.Gen.Bus.L. § 133.

**VI.** *Unfair Competition*

 Plaintiff has alleged a cause of action against Defendant arising under New York's common law of unfair competition. The Second Circuit recently explained that:

> The state law cause of action for unfair competition shares many common elements with the Lanham Act claims of false designation of origin and trademark infringement . . . including proof of actual confusion to recover damages . . . and proof of a likelihood of confusion for equitable relief.

*W.W.W. Pharmaceutical Co., Inc. v. Gillette Co.*, 984 F.2d 567, 576 (2d Cir.1993) (citations omitted). Plaintiff's failure to show actual confusion by consumers between the jewelry

at issue precludes recovery of damages based upon its claim of unfair competition.[29] *See Kregos v. Associated Press,* 795 F.Supp. 1325, 1337 (S.D.N.Y.1992), *aff'd,* 3 F.3d 656 (2d Cir.1993), *cert. denied,* 510 U.S. 1112, 114 S.Ct. 1056, 127 L.Ed.2d 376 (1994) (finding of no substantial similarity between disputed works precluded claim for unfair competition). Plaintiff's failure to introduce evidence proving a likelihood of confusion as to source with respect to jewelry made by Preville similarly precludes injunctive relief. *See Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621, 624 (2d Cir.1983). Accordingly, Plaintiff's claims under the New York common law of unfair competition must fail.

### Conclusion

For the above-stated reasons, Plaintiff Ripka's claims for injunctive relief against Defendant Penny Preville based on infringement of Plaintiff's copyright and trade dress on certain pieces of jewelry, violation of N.Y.Gen.Bus.Law §§ 368–d and 133 and violation of New York's common law of unfair competition must fail. A scheduling conference will be held on February 23, 1996 at 9:00 a.m.

---

29. Plaintiff provided no ground for its charge of unfair competition due to confusing source identification other than the alleged similarity between the two parties' jewelry. (Compl. ¶¶ 96–97)